**LEONARD PLATING COMPANY**

v.

**METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY.**

Court of Appeals of Tennessee, at Nashville.

Dec. 13, 2005 Session.

July 11, 2006.

Permission to Appeal Denied by Supreme Court Dec. 27, 2006.

Thomas G. Cross, Nashville, Tennessee, for the appellant, Metropolitan Government of Nashville and Davidson County.

Dan E. Huffstutter, Nashville, Tennessee, for the appellee, Leonard Plating Company.

## OPINION

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., JJ., joined.

This appeal involves a dispute between the Metropolitan Government and an electroplating business regarding the responsibility for damage to the city sewer line serving the business. After it was required to replace significant portions of the sewer line, the Metropolitan Government assessed the business a fine for violating its wastewater discharge permit, as well as $306,380 for the cost of replacing the damaged sewer line. After the Metropolitan Wastewater Hearing Authority affirmed the assessment, the business filed a petition for common-law writ of certiorari in the Chancery Court for Davidson County seeking judicial review of the Authority's decision affirming the assessment of the costs to replace the sewer line. The trial court overturned the Authority's decision because it concluded that the Authority had improperly allocated the burden of proof, that the record lacked evidence to support the Authority's decision, and that members of the Authority had relied on their own expertise in the absence of competent evidence that the business's wastewater had caused the damage to the sewer line. We have determined that the Authority did not employ an unlawful or arbitrary procedure in hearing and deciding this matter and that the record contained sufficient evidence from which the Authority could conclude that the wastewater from the electroplating business caused the damage to the sewer line.

## I.

Keith Leonard is the second generation owner of Leonard Plating Company, a Nashville electroplating business. Electroplating is a process used to coat an electrically conducive object with a thin layer of metal using electric current. The coating is accomplished by placing a negative charge on the object to be coated and then immersing the object in a solution which contains a salt of the metal to be deposited on the object. Leonard Plating coats objects with various metals[1] and uses several different acids in the course of its business.[2]

The electroplating process produces wastewater containing the acids and metals used in the process, and thus electroplating businesses in Nashville are subject to governmental regulation by the Environmental Compliance Section of the Storm Water Division of Metro Water Services.[3] The permits issued by the Environmental Compliance Section specify the pH[4] and chemical limits for the discharge from each permitted business. Leonard Plating has maintained a wastewater discharge permit since 1988 when the business moved into the building it currently occupies.[5] As a condition of maintaining

---

1. These metals include nickel, zinc, copper, silver, lead, chromium, and cadmium.

2. These acids include sulfuric acid, hydrochloric acid, nitric acid, chomic acid, and nickel sulfate.

3. Metro Water Services is a branch of the Metropolitan Government of Nashville and Davidson County (Metropolitan Government).

4. The acidity of a water sample is commonly measured using the pH scale which reflects the concentration of hydrogen ions in the water. The scale ranges from 0 (maximum acidity) to 14 (maximum alkalinity). The neutral point is 7, and acidity increases from the neutral point toward 0.

5. The building itself is much older, although the record does not indicate its precise age. Prior to Leonard Plating's occupancy, Coursey's Barbecue restaurant had occupied the building for several years. The Metro sewer

the permit, Metro Water Services performs semi-annual water quality tests on Leonard Plating's wastewater.[6] Leonard Plating has never been found to be in violation of its permit during the course of regular wastewater sampling since it moved to its current location.

In December of 2001, Metro Water Services conducted a routine inspection of the public sewer lines near Leonard Plating Company. As part of this inspection, a small motorized crawler equipped with a video camera was sent through the sewer pipe connecting Leonard Plating's plant to the main sewer line.[7] After the crawler tumbled into a hole in the bottom of an 8-inch concrete pipe, the inspectors discovered more than 1,600 linear feet of severely damaged pipe. This damage ranged from complete disintegration of the bottom of the pipe at the upstream end of the line nearest to the Leonard Plating plant to drastic thinning of the bottom interior surface of the pipe at the downstream end where the line connected to the larger sewer line. The damaged portion of pipe had served the Leonard Plating plant almost exclusively since 1988.[8]

During the course of its investigation into the cause of the damage to the sewer line, Metro Water Services installed sample collection equipment in the manholes immediately downstream and immediately upstream from the point of connection between Leonard Plating's service line and the public sewer. The equipment collected wastewater discharge every fifteen minutes for the entire period between May 13 and May 24, 2002, consolidating the samples into bottles comprising a sample from each hour of the day, every day. There was no flow into the manhole upstream from Leonard Plating's business. Analysis of the flow in the manhole downstream from Leonard Plating demonstrated that, during the collection period, the business exceeded its allowable discharge of several metals and that it twice discharged wastewater with an acidity level greater than its permitted pH range.[9]

On July 1, 2002, Metro Water Services issued a notice to Leonard Plating that it had violated its permit by discharging wastewater with acidity levels exceeding the limits of its permit. Leonard Plating promptly acquired equipment to neutralize the business's wastewater before releasing it into the sewer system.[10] Thereafter, Metro Water Services replaced the entire sewer line connecting Leonard Plating's plant with the main sewer line and informed Leonard Plating that the bottom of its connection pipe to the sewer line had eroded. Leonard Plating promptly replaced this connection.

Following a hearing in June 2003, Metro Water Services fined Leonard Plating $1,362.50 for its permit violations and then

line that services the building dates to approximately 1947.

6. Prior to 1999, the tests were performed quarterly. Due, in part, to the fact that Leonard Plating had never had any recorded violations, Metro Water Services reduced its testing frequency.

7. This line was installed in 1947.

8. The record is unclear as to whether and/or at what point in time the public portion of Leonard Plating's sewer line was shared by a small market. It is clear, however, that the only measurable amount of flow into the sewer line was discharged by Leonard Plating.

9. Leonard Plating's permit allows it to discharge wastewater with a pH level between 5 and 10; the samples included discharges with pH levels of 4.23 and 3.29.

10. Prior to July 2002, Leonard Plating had taken no steps to ensure that its wastewater discharge was within acceptable permit limits.

assessed Leonard Plating $306,380.00 for the costs of replacing the damaged sewer line.[11] Leonard Plating did not take issue with the fine but appealed the assessment of damages to the Metropolitan Waste Water Hearing Authority.

The Authority conducted a full hearing on January 15, 2004. Metro Water Services presented Al Pogue, who had participated in the testing of Leonard Plating's wastewater and in the investigation regarding the damage to the sewer line, and Robert Wingo, assistant director for Metro Water Services, who had been employed by the Metropolitan Government for over thirty years. Mr. Wingo explained that the city constructed the sewer system using concrete pipe prior to 1961 but thereafter began using other types of pipe because of concrete's susceptibility to decay, especially in the presence of acids. He also stated that Metro Water Services still had many miles of concrete sewers that were working "perfectly" in the absence of corrosive environments. Mr. Wingo stated that the damage to the sewer pipe connected to Leonard Plating's plant was caused by acid decay and that the damage he observed was "strikingly similar" to damage he had seen as a result of discharge from other electroplating companies.

Leonard Plating's principal defense was that the pattern of damage in the sewer pipes was not consistent with damage that would be expected to occur as the result of acidic discharges from Leonard Plating's plant. It argued that if the damage had been caused by acidic wastewater, the most damaged portions of the pipe would be closest to the plant. Leonard Plating called Chuck Powers, the plumbing manager of the company that had repaired Leonard Plating's connection with the sewer line, who testified that the portions of the company's private sewer line closest to the plant were not damaged at all. Mr. Powers also testified that he had observed deterioration in the pipes of other clients similar to the deterioration in Leonard Plating's pipes when the damage had not been caused by acidic wastewater.

Leonard Plating also called Ted Kisselovich, an engineering consultant specializing in concrete, who testified that he had observed similar concrete deterioration in circumstances that did not involve the commercial use of acid. Additionally, he stated that the decomposition of organic matter creates uremic acid which, over time, can reduce the thickness of concrete. He also theorized that the damage to the sewer lines could have been caused by the wastewater discharges from Coursey's Barbecue that had operated in Leonard Plating's building before Leonard Plating moved in.

The Authority conducted an on-the-record deliberation and affirmed the $306,380 assessment of costs to Leonard Plating. During the deliberations, the Authority's chairperson, Dr. Edward Thackston, an emeritus professor of civil engineering, observed that he considered this to be a "classic case of sewer corrosion due to acids in the discharge." He also stated that he had observed concrete pipe corrode in a time as short as five years when exposed to pH levels between 5 and 6. Finally, he expressed skepticism with Leonard Plating's defense because different batches of concrete differed widely in their composition and in their resistance to corrosive elements. Following Dr. Thackston's observations, the Authority voted to uphold the assessment and entered an or-

11. Tenn.Code Ann. § 69–3–126(a)(2004) empowers Metro Water Services to recover damages caused by a polluter's permit violation.

der embodying its decision on February 9, 2004.

On April 1, 2004, Leonard Plating filed a petition for common-law writ of certiorari in accordance with Tenn.Code Ann. § 69–3–124(b) (2004) in the Chancery Court for Davidson County seeking judicial review of the Authority's February 9, 2004 order. Following a review of the record, the trial court overturned the Authority's decision for three reasons. First, the court determined that the record did not contain material evidence to establish that the wastewater discharged from Leonard Plating's plant had caused the damage to the sewer pipes. Second, the court concluded that the Authority had improperly placed the burden on Leonard Plating to prove that the damage to the sewer pipes had not been caused by the wastewater from its plant. Third, the court determined that the Board had relied solely on its own expertise to make up for the lack of other evidence connecting Leonard Plating's wastewater to the damage to the sewer pipes. The Metropolitan Government has appealed this decision.

## II.

### FACTUAL SUPPORT FOR THE AUTHORITY'S DECISION

The Metropolitan Government's principal argument is that the trial court exceeded the permissible scope of review under a common-law writ of certiorari by improperly weighing the evidence rather than simply determining whether the record contained material evidence to support the Authority's decision. For its part, Leonard Plating asserts that the trial court properly reviewed the evidentiary support for the Authority's decision. While we commend the trial court's careful review of the record, we find that the trial court exceeded its authority by weighing the evidence. Because we have determined that the record contains material evidence to support the Authority's decision, we reverse the trial court's conclusion that the record does not contain sufficient evidence to support the Authority's conclusion that the wastewater discharge from Leonard Plating's plant caused the damage to the sewer lines.

### A.

The scope of review afforded by a common-law writ of certiorari is extremely limited. *Willis v. Tennessee Dept. of Correction,* 113 S.W.3d 706, 712 (Tenn.2003); *Lafferty v. City of Winchester,* 46 S.W.3d 752, 758 (Tenn.Ct.App.2000). Reviewing courts may grant relief only when the board or agency whose decision is being reviewed has exceeded its jurisdiction or has acted illegally, arbitrarily, or fraudulently. Tenn.Code Ann. § 27–8–101 (2000); *In re Gant,* 937 S.W.2d 842, 844–45 (Tenn.1996); *Lewis v. Bedford County Bd. of Zoning App.,* 174 S.W.3d 241, 245–46 (Tenn.Ct.App.2004).

Review under a common-law writ of certiorari does not extend to a redetermination of the facts found by the board or agency whose decision is being reviewed. *Tennessee Waste Movers, Inc. v. Loudon County,* 160 S.W.3d 517, 521 n. 2 (Tenn. 2005); *Cooper v. Williamson County Bd. of Educ.,* 746 S.W.2d 176, 179 (Tenn.1987). The courts may not (1) inquire into the intrinsic correctness of the decision,[12] (2) reweigh the evidence,[13] or (3) substitute

**12.** *Arnold v. Tenn. Bd. of Paroles,* 956 S.W.2d 478, 480 (Tenn.1997); *Hall v. McLesky,* 83 S.W.3d 752, 757 (Tenn.Ct.App.2001).

**13.** *Watts v. Civil Serv. Bd. for Columbia,* 606 S.W.2d 274, 277 (Tenn.1980); *City of Elizabethton v. Sluder,* 534 S.W.2d 115, 118 (Tenn. 1976); *Hoover v. Metro. Bd. of Zoning Ap-*

their judgment for that of the board or agency.[14] However, they may review the record solely to determine whether it contains any material evidence to support the decision because a decision without evidentiary support is an arbitrary one. *Watts v. Civil Serv. Bd. for Columbia*, 606 S.W.2d at 276–77; *Lewis v. Bedford County Bd. of Zoning App.*, 174 S.W.3d at 246; *Lafferty v. City of Winchester*, 46 S.W.3d at 759; *Sexton v. Anderson County*, 587 S.W.2d 663, 667 (Tenn.Ct.App.1979).

■■■ Ascertaining whether the record contains material evidence to support the board's or agency's decision is a question of law. *Lafferty v. City of Winchester*, 46 S.W.3d at 759. For the purpose of this inquiry, "material evidence" is relevant evidence that a reasonable person would accept as adequate to support a rational conclusion. *Lafferty v. City of Winchester*, 46 S.W.3d at 759; *Hedgepath v. Norton*, 839 S.W.2d 416, 421 (Tenn.Ct.App.1992); *Pace v. Garbage Disposal Dist.*, 54 Tenn. App. 263, 267, 390 S.W.2d 461, 463 (1965). The amount of material evidence required to support a board's or agency's decision must exceed a scintilla of evidence but may be less than a preponderance of the evidence. *See Bacardi v. Tenn. Bd. of Registration in Podiatry*, 124 S.W.3d 553, 561 (Tenn.Ct.App.2003); *Methodist Healthcare–Jackson Hosp. v. Jackson–Madison County Gen. Hosp. Dist.*, 129 S.W.3d 57, 63 (Tenn.Ct.App.2003); *Martin v. Size-*

*more*, 78 S.W.3d 249, 278 (Tenn.Ct.App. 2001).

## B.

The trial court was plainly dissatisfied with the Metropolitan Government's evidence establishing that the damage to the concrete sewer charge was caused by wastewater from Leonard Plating's plant. While the court determined that the record contained sufficient evidence to conclude that Leonard Plating had violated its permit by discharging wastewater into the sewer that exceeded the permissible level of acidity, the court decided that the record does not contain material evidence establishing that the wastewater from Leonard Plating's plant caused the damage to the sewer line. We have determined that the trial court reached this result by impermissibly weighing the evidence.

The court's reasoning is reflected in its memorandum opinion. After noting that Mr. Pogue's testimony did not relate directly to the question of causation, the court turned its attention to the testimony of Mr. Wingo. Mr. Wingo, whose expertise was not questioned, stated that "acid is not very friendly to concrete pipe" and that discharges with levels of acidity similar to the ones involved in this case could damage concrete pipes in "a matter of a few months."[15] He also testified that he had observed damaged sewer pipe "strikingly similar" to the damaged pipe involved in this case at other plating companies.[16]

---

*peals*, 924 S.W.2d 900, 904 (Tenn.Ct.App. 1996).

**14.** *McCallen v. City of Memphis*, 786 S.W.2d 633, 641–42 (Tenn.1990); *421 Corp. v. Metro. Gov't of Nashville and Davidson County*, 36 S.W.3d 469, 474 (Tenn.Ct.App.2000).

**15.** Mr. Wingo testified: "My experience has been, honestly, with other examples that we've seen, a matter of a few months and the pipe is gone when we have the kinds of dis-

charge that I'm understanding we've got here."

**16.** Specifically, Mr. Wingo testified: "With respect to history, my knowledge of reaction of acids in concrete pipe, we've had some events of that. I don't know if I'm permitted to cite specifics, but we've had other—actually other plating events, plating company events, that are strikingly similar in which we had the same sort of thing." He continued,

After characterizing Mr. Wingo's testimony as "equivocal and inconclusive," the trial court turned its attention to the evidence presented by Leonard Plating. The court stated:

> Detracting from the claim that the petitioner's discharge corroded the pipe was the testimony of Mr. Kisselvoich, a consultant with an environmental firm of PSI. He testified that the activity of the former occupant of the building, a barbeque [sic] restaurant known as Coursey's, had deposited food in the pipe, that there was low velocity of water going through the pipe, and that he could not say that the pH level of the petitioner had caused the pipe to wear out.

The court also noted that Mr. Powers's testimony "detract[ed] from placing causation on the petitioner [Leonard Plating]." [17]

■ The trial court's memorandum opinion reflects that it overstepped the permissible boundaries of the search for material evidence. The Metropolitan Government presented evidence establishing (1) that the wastewater from Leonard Plating comprised essentially all of the flow in the most severely damaged sewer pipes, (2) that Leonard Plating uses acids in its electroplating process which it discharges into the sewer, (3) that until July 2002, Leonard Plating made no effort to monitor or control the acidity of its wastewater, and (4) that samples of the wastewater discharged from Leonard Plating's plant exceeded permissible levels of acidity. All this is material evidence upon which a reasonable person could rely to make a rational decision that the excess acidity in Leonard Plating's wastewater caused the damage in the sewer pipes that required them to be replaced. Although the trial court acknowledged this evidence, it went further and weighed the Metropolitan Government's evidence against the evidence offered by Leonard Plating. This a trial court cannot do when reviewing a board's or agency's decision pursuant to a common-law writ of certiorari.

## III.

### THE ALLOCATION OF THE BURDEN OF PROOF

The trial court also found as a matter of law that the Authority had impermissibly placed the burden on Leonard Plating to prove that the acid in its wastewater had not caused the damage to the sewer pipes that required their replacement. The court's conclusion is based on the Authority's deliberations after the parties had presented their evidence. We interpret the proceedings differently.

■ The Metropolitan Government proved (1) that the sewer line serving Leonard Plating was seriously damaged, (2) that the damage was consistent with damage caused by acid, (3) that sewer lines serving other electroplating businesses had similar damage, and (4) that Leonard Plating's wastewater was acidic enough to cause the sort of damage observed in the sewer lines. This evidence, circumstantial as it is, was sufficient to make out a prima facie case that the wastewater from Leonard Plating caused the damage that required the sewer lines to be replaced. It was also sufficient to shift the burden of going forward with the evidence to Leonard Plating to prove that the damage was caused by something else.

---

"... [W]e have seen in the past perfect examples of the same thing that we're seeing here. I'm not sure exactly what else you want to hear from me, but we've had a lot of history of having seen this, unfortunately."

17. Mr. Powers speculated that the damage could have been caused by "tomato acid."

The Authority's deliberations reflect the fact that its members accredited the Metropolitan Government's evidence that the wastewater from Leonard Plating's plant had damaged the sewer lines and that the wastewater exceeded the pH limits in Leonard Plating's permit. The Authority's comments that concerned the trial court simply reflect that its members decided that Leonard Plating had failed to produce sufficient evidence to rebut the Metropolitan Government's evidence.[18] The Authority did not improperly allocate the burden of proof. To the contrary, its reasoning is entirely consistent with a rational and reasonable assessment of the evidence.

## IV.

### THE AUTHORITY'S RELIANCE ON ITS OWN EXPERTISE

Finally, the Metropolitan Government asserts that the trial court erred by concluding that the members of the Authority based their decision on their own knowledge and expertise rather than on the evidence thus acting in violation of *Martin v. Sizemore*, 78 S.W.3d 249 (Tenn.Ct.App. 2001). It argues that the trial court read too much into *Martin v. Sizemore*. We agree.

One of the principal reasons for the creation of administrative agencies is the expectation that the agency members will bring substantive expertise to the matters within their jurisdiction. 1 CHARLES H. KOCH, ADMINISTRATIVE LAW AND PRACTICE § 1.2(g), at 9 (2d ed. Supp.2002–03) (KOCH). Thus, the expertise of members of administrative boards and commissions plays a central role in administrative pro-

ceedings. *Martin v. Sizemore*, 78 S.W.3d at 269. Agencies are not lay juries, 2 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 10.2, at 708 (4th ed.2002), and, therefore, they are permitted to rely on their expertise in evaluating the evidence submitted to them as long as they disclose that they are doing so. 3 KOCH § 9.2[4], at 5.

However, a board's or agency's findings must be based on evidence presented to them. Courts should decline to accept agency findings that are not supported by evidence simply because the findings were made by experts. 3 KOCH § 12. 24[3](a), at 222. Accordingly, this court has held that members of boards and agencies cannot rely on their own expertise as a substitute for expert testimony that should have been presented during the hearing because doing so seriously compromises the fairness of the administrative proceeding. *Martin v. Sizemore*, 78 S.W.3d at 269–70.

This case does not involve an evidentiary void like the one confronting the court in *Martin v. Sizemore*, which involved a disciplinary proceeding against a licensed architect. In that case, several charges against the architect required determining whether he had breached the standards of professional conduct. Even though these determinations required expert testimony, the State presented no expert evidence that the architect's conduct fell below the applicable standard of care. Nonetheless, the licensing board, relying on its own expertise, decided that the architect's conduct breached the standards of professional conduct.

---

18. For example, Dr. Robert Wingfield noted, "So there is not ... enough evidence to say that this [the damage] is not due to the discharge from Leonard. There's just not enough evidence to say that, and there is not enough evidence to say that this is due to anybody else...."

The record in this case contains evidence regarding the acidity of the wastewater discharged by Leonard Plating, the history of Leonard Plating's failure to monitor or mitigate the acidity of its wastewater, the fact that Leonard Plating's wastewater accounted for virtually all of the flow in the sewer lines, the similarity between the damage to the sewer line serving Leonard Plating and the damage found in sewer line serving other electroplating businesses, and the conclusion of an expert employed by Metro Water Services that the damage to the sewer line was caused by acid.[19] This evidence provided an ample basis for the chairman of the Authority and the other members, in the exercise of their training and experience, to conclude that the damage to the sewer pipes was caused by the excess acidity of the wastewater discharged from Leonard Plating.

## V.

We reverse the judgment reversing the Metro Water Authority's $306,380 assessment against Leonard Plating and remand the case to the trial court for further proceedings consistent with this opinion. We tax the costs of this appeal to Leonard Plating Company for which execution, if necessary, may issue.

---

19. Leonard Plating's witnesses even conceded that the damage could have been caused by acid.