IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 18, 2011 Session

# BYRON AVENUE 3501, LLC v. METROPOLITAN HISTORIC ZONING COMMISSION OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TN

**Appeal from the Chancery Court for Davidson County**
**No. 09-0960-IV      Russell T. Perkins, Chancellor**

<hr />

**No. M2010-01652-COA-R3-CV - Filed May 24, 2011**

<hr />

The purchaser of historic property appeals the Metropolitan Historic Zoning Commission's denial of a demolition permit based on economic hardship. The Commission's denial was affirmed by the chancery court. We find that the Commission's denial was not supported by material evidence and remand the case to the trial court with instructions to return the matter to the Commission for a new hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Thomas V. White, Nashville, Tennessee, for the appellant, Byron Avenue 3501, LLC.

J. Brooks Fox and Christopher Michael Lackey, Nashville, Tennessee, for the appellee, Metropolitan Historic Zoning Commission of the Metropolitan Government of Nashville and Davidson County, TN.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

The subject of this appeal is property that served as an elementary school from 1918 to 1974. The Metropolitan Government of Nashville and Davidson County ("Metro") placed the property up for auction on its eBid website on January 18, 2008. Byron Avenue 3501, LLC ("Byron") submitted the winning bid of $1,100,000 when the auction closed on March

18, 2008. At the time the property was placed up for auction, it was zoned RS7.5, which allowed eighteen residential units to be built on the property. On the night of March 18, 2008, after the auction concluded, the Metro Council passed the third and final reading of an ordinance that re-zoned the property from RS7.5 to SP (specific plan), which allowed only eleven residential units to be built on the property. The trial court found that Byron was unaware of the zoning change when it entered its bid and that Metro did not attempt to give notice to the bidders of the change prior to the enactment of the ordinance.[1] Byron purchased the property on August 26, 2008.

Byron's original plan had been to rehabilitate the school buildings and build eighteen residential condominium units inside the existing buildings. After the re-zoning, Byron sought relief under the economic hardship provisions found at § 17.40.420 of the Metro Code; these provisions allow a property owner who is bound by historic zoning to demolish an existing structure when using that structure is not economically feasible. On February 2, 2009, Byron applied to the Metropolitan Historic Zoning Commission ("Commission") for a demolition permit due to economic hardship. Byron submitted a report in support of its application, which included opinion letters from experts, contractor bids, and real estate pricing comparisons showing that building only eleven units would result in economic loss for Byron.

The Commission staff recommended on February 18, 2009, that the Commission deny the permit. On March 18, 2009, a public hearing was held where Byron presented its case. The Commission voted to deny the permit.

Byron filed suit in the form of a common law writ of certiorari on May 15, 2009. Hoping to avoid litigation, Byron reapplied for a permit on the basis of a new site plan for the property on October 8, 2009. Byron again submitted evidence of economic hardship with opinion letters from experts, contractor bids, and real estate pricing comparisons projecting economic loss.

The Commission staff again recommended disapproval of the project, finding that Byron had undervalued the project and overestimated construction costs. A hearing before the Commission was set for November 18, 2009.

Byron alleges that, a few days prior to the November 18th hearing, a series of emails were exchanged between a Commission staff member and Commissioner DeCuyper. Byron claims that DeCuyper manufactured projected pricing comparisons for the purpose of

---

[1] Byron claims that the eBid website showed the existing base zone that would have allowed eighteen units to be built.

defeating Byron's application and had those comparisons included in the staff report and presented to the Commission. Byron claims that the DeCuyper comparisons stated an artificially high price for condo units within the school structure. Byron further claims that these acts were then covered up by the Commission staff and hidden from both Byron and other commissioners until the record was released for this suit.

At the November 18, 2009 hearing, Commissioner DeCuyper disclosed that he owned property less than two blocks away from the area at issue, but he did not recuse himself from voting on the application. The Commissioners voted to deny the permit, 4-2.

On January 15, 2010, this case was heard in chancery court. The court concluded that there is substantial and material evidence that could support a finding in favor of Byron, but there is also substantial and material evidence that supports the Commission's decision to deny Byron's application. The court stated that the Commission was entitled to rely on the recommendations of its staff. The court found that the Commission's decision was not fraught with illegality and did not deprive Byron of due process.[2]

STANDARD OF REVIEW

The scope of review with respect to a common law writ of certiorari is limited. *Watts v. Civil Serv. Bd.*, 606 S.W.2d 274, 276 (Tenn. 1980); *Leonard Plating Co. v. Metro. Gov't of Nashville & Davidson County*, 213 S.W.3d 898, 903 (Tenn. Ct. App. 2006). A reviewing court may grant relief only upon a determination that the action by the administrative body was: "(1) in violation of constitutional or statutory provisions; (2) in excess of statutory authority; (3) an unlawful procedure; (4) arbitrary or capricious; or (5) unsupported by material evidence." *Demonbreun v. Metro. Bd. of Zoning Appeals*, 206 S.W.3d 42, 46 (Tenn. Ct. App. 2005). The scope of review by the appellate courts is no broader than that of the chancery court in these cases with respect to evidence presented before the administrative body. *Watts*, 606 S.W.2d at 277.

Reviewing a common law writ of certiorari "does not extend to a redetermination of the facts found by the board or agency whose decision is being reviewed." *Leonard Plating*, 213 S.W.3d at 903. Courts are not permitted to "(1) inquire into the intrinsic correctness of the decision, (2) reweigh the evidence, or (3) substitute their judgment for that of the board or agency." *Id.* at 903-04 (footnotes omitted). Rather, the courts must review the board's decision to determine whether there is any material evidence to support the decision; "a decision without evidentiary support is an arbitrary one." *Id.* at 904. The determination of

_____

[2] The court noted that Commissioner DeCuyper should have abstained, but that the outcome would not have changed if he had abstained.

whether the board's decision is supported by material evidence is a question of law. *Id.* To support a board's decision, the material evidence "must exceed a scintilla of evidence but may be less than a preponderance of the evidence." *Id.*

ANALYSIS

On appeal, Byron asserts that the Commission's decision to deny its permit should be reversed because (1) the Commission acted arbitrarily, or (2) the Commission violated Byron's due process rights by denying a fair hearing. In the alternative, Byron asserts that this court should compel the Commission to issue the permit.

Our analysis of whether the trial court erred in its decision begins with a review of the authority under which the Commission was operating. The Commission has the authority to make determinations regarding the "appropriateness of demolishing any structure or other improvement." Metro Code § 17.40.410(C)(6). The Commission may consider economic hardship in reviewing an application to remove a historic structure. Metro Code § 17.40.420(D). The Commission may consider the following factors in making an economic hardship determination:

1. An estimated cost of demolition and any other proposed redevelopment as compared to the estimated cost of compliance with the determinations of the historic zoning commission;

2. A report from a licensed engineer or architect with experience in rehabilitation as to the structural soundness of the subject structure or improvement and its suitability for rehabilitation;

3. The estimated market value of the property in its current condition; its estimated market value after the proposed undertaking; and its estimated value after compliance with the determinations of the historic zoning commission.

4. An estimate from an architect, developer, real estate consultant, appraiser, or other real estate professional experienced in rehabilitation as to the economic feasibility of rehabilitation or reuse of the existing structure.

5. Amount paid for the property, the date of purchase, and the party from whom purchased, including a description of the relationship, if any, between the owner of record or applicant and the person from whom the property was purchased, and any terms of financing between the seller and buyer.

6. If the property is income-producing, the annual gross income from the property for the previous two years; itemized operating and maintenance expenses for the previous two years; and depreciation deduction and annual cash flow before and after debt service, if any, during the same period.

7. Any other information considered necessary by the commission to a determination as to whether the property does yield or may yield a reasonable return to the owners.

Metro Code § 17.40.420(D).

Byron submitted reports in support of its two applications, in February 2009 and October 2009, which correspond to the above factors. The two reports contain substantially the same materials and information. We have summarized Byron's submissions below.

1. In its February 2009 application, Byron submitted calculations which showed that development of eleven condo units within the existing building would result in a net loss of $211,486 (with demolition and mitigation costs of $20,453 per unit), while development of eleven single-family detached homes would result in a net profit of $1,721,632 (with demolition and mitigation costs of $18,180 per unit).

Byron included a letter from Steve Vaughn, the president of a demolition company, presenting bids for demolition on the project. The prices were $62,000 for asbestos abatement, $163,000 for interior demolition with facade preserved, and $138,000 for total building demolition.

In its October 2009 application, Byron submitted calculations which showed that development of eleven condo units within the existing building would result in a net loss of $326,826 (with demolition and mitigation costs of $33,493 per unit), while development of eleven single-family detached homes would result in a net profit of $1,382,832 (with demolition and mitigation costs of $18,180 per unit).[3]

_____

[3] The plans for the eleven condo units within the existing building were different for Byron's February and October 2009 applications. The average square footage per unit was listed as 1,300 in the February application and 2,210 in the October application. The plans for the eleven single-family homes, however, remained the same in the February and October applications. The square footage was listed as 2,800 in both applications and the construction costs remained the same. The difference between the net loss figures used for the single-family home plan in the February and October applications is attributable to a
(continued...)

2. Byron submitted a letter from Mark Buchanan, a licensed professional engineer, which summarized his firm's findings. Mr. Buchanan stated that the foundation walls were exhibiting signs of moisture infiltration. Mr. Buchanan surmised that "buildings of this vintage typically do not conform to modern codes when evaluating lateral load systems" and "[i]t is doubtful that a building of this vintage would meet the structural requirements of the current International Building Code." Mr. Buchanan stated that "dividing the existing space into residential units may create challenges when adapting the building" since all bedrooms must have an exit to the outside. Finally, Mr. Buchanan noted that renovation costs for projects of this nature are typically twice the costs of new construction due to selective demolition and the time required to address the existing conditions. Mr. Buchanan concluded that "the costs associated with renovating the existing school building to residential buildings will far exceed the cost of new construction."

Byron also submitted a letter from Michael Busby, a professional engineer, who stated that "the structure is in an advanced stage of dilapidation" including moisture damage, standing water, loose asbestos insulation, and musty odors. Mr. Busby stated his opinion that, "to bring the current structure up to code structurally and thermally (insulation) and to achieve a healthy level of indoor air quality, the costs in time and money would far exceed the cost of new construction and would most likely require a sales price that would not be competitive in the market area."

3. In its April 2009 report, Byron stated that the estimated market value of the property in its current condition was $1,100,000. Its estimated value if developed with demolition was $6,036,800. Its estimated value without demolition was $3,346,200.

In its October 2009 report, Byron stated that the estimated market value of the property in its current condition was $445,000. Its estimated value if developed with demolition was $5,698,000. Its estimated value without demolition was $5,032,170.

4. Byron submitted a letter from Hal Rosson, a real estate broker in Nashville with thirty-seven years of experience in the real estate business and

---

[3](...continued)
difference in projected sales price per unit, which was listed as $548,800 in the February application and $518,000 in the October application.

involvement in the sale of approximately 400 condominiums and 600 single-family homes. Mr. Rosson stated that while he typically supports rehabilitating existing structures, he felt strongly that "this building has outlived its use." Mr. Rosson noted that "the multiple listing service indicates 62 condominiums for sale that were built between 2006 and 2009 in a price range of $310,000 to $600,000," which "represents a supply that may take 12 to 18 months to sell." Conversely, Mr. Rosson noted that only seven new or recently built single-family homes built between 2006 and 2009 exist in the same price range, which "represents a supply that should sell within the next 60 to 70 days." Mr. Rosson concluded that the proposal to build eleven single-family homes was the best use of the property for the neighborhood, as well as potential homeowners.

A letter from Barry Cleveland, a geologist, details his firm's findings after inspection of the building, which included asbestos, missing water pipe, damaged plaster, lead-based paint, and water damage. Mr. Cleveland estimated that abatement and mitigation of mold, lead paint, and asbestos for the building would cost between $100,000 and $250,000.

A letter from David Dodd, the president of an electrical company, states that all of the existing wiring would have to be removed and new wiring installed throughout the building. He projected this would cost $450,000.

As discussed above, letters from Mr. Buchanan and Mr. Busby noted their opinions that the costs of rehabilitation would far exceed the costs of new construction.

5. Byron's report stated that the amount paid for the property on March 18, 2008, was $1,100,000, that the previous owner was the Metropolitan Government of Nashville, and that the terms of financing were cash with no financing.

6. Byron's report included a statement that the property was owned by Metro the two previous years and was not income-producing. Byron noted that it was "unable to obtain itemized operating and maintenance expenses for the previous 2 years."

7. Byron notes that it responded to the questions and comments posed by the Commission staff. Byron's report also included its proposed adaptive reuse

plan, proposed redevelopment plan, streetscape elevations, architectural influences, proposed architectural styles, and site plan data.

The Commission staff drafted reports in response to each of Byron's two applications for a demolition permit. In its first report, the staff recommended disapproval or deferral. In its second report, the staff recommended disapproval.

The staff's first report, dated February 18, 2009, corresponds to the factors listed in Metro Code § 17.40.420(D), which Byron addressed in its application. We have summarized the staff's comments below.

1. The staff first commented that Byron chose "the most severe type of demolition" and "a more minimal, selected demolition would leave the building's original character in place, cost less, and could add value to the finished marketed product."

The staff further stated that the rehabilitation plan (using the existing building) "does not provide enough information to determine the economic viability of the building." The staff made the following criticisms with regard to Byron's rehabilitation plan: "the single proposed floor plan submitted does not adapt well into different shaped units"; "the total area utilized for condos totals 14,300 square feet., [sic] however the total area of the building is 27,000 square feet"; the costs of the foundation, roofing, insulation, mechanical, electrical, and masonry "seem inflated in comparison to the cost for the new construction"; and "lack of exploring other possible viable options, such as rehabilitating the existing building into fewer units that is supplemented with some new construction, and adding additional living area through the conversion of basement and attic space."

2. The staff reported that Mr. Buchanan's letter "makes generalizations about older buildings, but provides little detail about Ransom School." The report also states that staff "toured the building on at least three occasions over the last 14 months" and "saw no evidence of structural damage or moisture problems."

3. The staff commented that Byron provided "inadequate information . . . as to the type of finishes and detailing that will be used for the proposed renovations/rehab as compared to the comparable properties that were provided." The staff noted that "[t]he comparable properties that were

provided vary wildy from High-rises to properties outside of the West End Area."

4. The staff stated, "There has only been a single plan presented for redevelopment of the building."

5. The staff made no comments.

6. The staff made no comments.

7. The staff suggested setting up a date to allow Commission members to inspect the building to gain a better understanding of the existing conditions.

We first note that the staff's report is largely speculative and unsupported by any reference to experts or guidelines. The staff did not, for example, cite any source for its conclusion that a more minimal demolition would cost less. The demolition bid included in Byron's report shows that interior demolition done to preserve the facade would cost $25,000 more than demolition of the entire building. With regard to factor 2, the staff's characterization of Mr. Buchanan's letter as making "generalizations about other buildings" while providing "little detail about Ransom School" is inaccurate. Mr. Buchanan outlined the different materials that comprise the various sections of the building, including the basement, corridors, roof, gym, flooring, crawlspace, and exterior. He then applied his knowledge of various building codes to discuss the types of changes that would need to be made in order to rehabilitate the building. We also note that the staff expressed skepticism about structural damage and moisture problems in the building while Mr. Buchanan's findings with regard to these two issues were substantiated by Mr. Busby and Mr. Cleveland. Additionally, with regard to factor 4, Byron claims to have submitted fourteen plans to the board. Byron's application does contain fourteen different aerial depictions of how units on the property might be laid out, although there do not appear to be more detailed plans that correspond to each of the fourteen depictions.

The staff's second report, dated November 18, 2009, addresses the factors of Metro Code § 17.40.420(D) more generally rather than one-by-one. The staff concluded that Byron "undervalued the project." To reach this conclusion, the staff narrowed the specifications for comparables from those used by Byron. The staff noted that Byron "provided a broad view of sell price comparables from low- to high-rise condominiums throughout Nashville." The staff made the following changes:

To gain a more workable view of this specific area, staff has narrowed the price of comparables to three- and two-bedroom condominium units, in mid-

rise buildings, within a mile of the property, that have sold recently (May 2009-October 2009). The average value of those units is $214.47 per square foot. At this cost per square ft. sell price would equate to an approximate loss of $68,600. Certainly the market has varied greatly in the past few months; however, the most recent sale, just last month, sold for $232.84 per square foot. The applicant proposes to rehabilitate 24,668 square feet of the 27,000 available square feet, or 91.4% of the existing building. To break even, the owner would need to make $217.25 per square foot. A reconsideration of the construction cost could mitigate or even eliminate this loss.

The staff next identified five items that needed additional explanation in order to "substantiate" Byron's construction estimate—interior layout, roofing, electrical, framing, and tuck pointing. The staff commented as follows:

Interior layout: The potential units have been devalued by not working with the existing layout and utilizing existing load-bearing walls. For example, a higher level of response to configuring units based on the existing space configurations might allow for a loft in a unit(s) located in the theater/gymnasium space . . . and the use of hallways as living space, bathrooms or closets without removing load bearing walls. In addition, features such as original wainscoting, windows and doors are valued assets to buyers of historic properties and could be reused. . . .

Electrical (line item 32, $56,778): . . . The electrical costs are high because of the assumed need of a ground-mounted transformer unit as opposed to multiple poles and need to bury lines underground but this may not be the only solution. For instance, it may be possible to bring in overhead lines and enter the buildings at two different locations in the rear with service running in crawl spaces thereby eliminating long runs and the need to bury lines. Staff recommends more exploration of actual costs for the electrical estimate.

Roofing (line item 20, $22,435): The applicant has stated that a full new roof is necessary to warranty the construction and has estimated it at $22,435 (line item 20) per unit or $246,785 total. Using recent roofing estimates staff finds that a typical roof would cost approximately, $93,000 ($8,454 per unit) a total difference of $153,785.

[Chart outlining estimated roofing costs per section of roof omitted.]

-10-

Framing (line item 18): The estimate for framing is $42,177. Again, staff found that existing interior conditions were not creatively used which may be a reason for the high framing costs. Using existing conditions might also lessen the concrete footing material costs. . . .

Tuck pointing (line item 23, $6,580): Staff would like to see more information on the estimated 20-40% of brick needing to be tuck pointed. Based on a recent site visit, staff evaluated that about 10% of the building needs tuck pointing. . . .

The staff also noted that Byron "has a 'self-created' hardship due to the fact that the property had the historic preservation overlay at the time of purchase and so [Byron] should not have assumed the buildings could be demolished." The staff concluded by recommending disapproval.

At the public hearing before the Commission on November 18, 2009, Byron's representative, John Haas, pointed out what it alleged were mistakes in the staff report. First, Mr. Haas discussed why some of the comps used in the staff report were not an accurate measure of projected sales price for the Byron property. Byron used the following criteria for its own comps: properties sold since January 1, 2009, built in 2005 or later, three-stories or less, condominium units only, and within the ZIP codes of 37203, 37204, and 37212. That resulted in an average sale price of $207 per square foot. The comps used by the Commission staff resulted in an average sales price of $214.47 per square foot. Mr. Haas pointed out that one of the units used by the staff was a townhouse rather than a mid-rise condominium. Mr. Haas then noted that the staff had used the asking price ($232.84) rather than the sales price ($188) for one unit. Additionally, Mr. Haas noted that the highest priced unit among the staff's comps was also the one located the farthest from the Byron property.[4] Mr. Haas argued that that property, with a sales price of $358 per square foot, was one and a half times the average sales price of the rest of the units and thus skewed the results toward $214. Finally, Mr. Haas noted that several units that were included in Byron's report and should have been included in the staff's report were not. Mr. Haas concluded that staff's comps "were picked for subjective reasons."

Mr. Haas also argued that the staff erred in its conclusion that Byron stood to lose only $68,000 using the staff's own $214.47 per square foot average sales price figure. Byron's

_____

[4] Apparently the Commission staff changed the criteria for the properties included in its report to include properties in a two-mile radius of the Byron property rather than the one-mile radius that it originally claimed to have used. According to Mr. Haas at the Commission hearing on November 18, 2009, this was done the afternoon before the hearing and Byron was not aware of that change until the hearing.

total cost per square foot, as submitted, was $220.44, for a total cost of $5,358,896.40. Using the staff's projected sale price of $214.47 per square foot, multiplying it by the total square footage, and subtracting it from the total cost results in a total loss of $145,233. Mr. Haas then discussed additional costs to Byron that had been left out of the calculations thus far. Mr. Haas added the interest cost on a $3,000,000 construction loan for one year at 6% ($180,000), the closing cost on a $3,000,000 loan at 1% ($30,000), and the cost of 6% commission on each unit being sold for $487,182 ($321,540). Mr. Haas concluded that, adding these costs to the loss already projected on renovating and selling the units ($145,233), total loss on the property would be over $676,000.

The commissioners then debated whether to issue the demolition permit based on economic hardship before they voted. A point that was discussed by the commissioners at the hearing, and one that Metro raises on appeal, is whether the commissioners should rely upon the staff's determination that Byron's condition was self-created. On appeal, Metro insists that an economic hardship may not be self-created. Metro claims that Byron's hardship was self-created because it purchased property it knew to be subject to certain zoning restrictions. Metro cites no Tennessee law in support of its position.[5] There is no exclusion for self-created hardship in the Metro Code, and it is not among the factors listed for consideration of an economic hardship under Metro Code § 17.40.420(D). The trial court was "not convinced that Tennessee appellate courts have recognized the 'self-created' economic hardship doctrine."[6] We agree.

Our review of the record leads us to conclude that the Commission's decision to deny the permit is not supported by material evidence. The staff reports upon which the Commission relied are largely speculative. Byron has demonstrated that, using the staff's

---

[5] Metro cites two Tennessee cases that concern a zoning board's refusal to issue a variance from zoning regulations and a buyer's obligation to comply with a planned unit development district overlay. *See Union Trust Co. v. Williamson County Bd. of Zoning Appeals*, 500 S.W.2d 608 (Tenn. 1973); *Metro. Gov't of Nashville & Davidson County v. Barry Constr. Co., Inc.*, 240 S.W.3d 840 (Tenn. Ct. App. 2007). The Metro Code explicitly states that a variance may only be granted if the applicant proves, among other things, that a hardship is not self-imposed. Metro Code § 17.40.370(C). No such requirement exists in the Metro Code for economic hardship applicants under Metro Code § 17.40.420 .

[6] The trial court stated that the Commission is free to consider the fact that a buyer paid too much for property that was in the process of being re-zoned in deciding whether there is an economic hardship that warrants demolition. We note that the Metro Code instructs that the Commission may consider the market value of the property in its current condition, its estimated market value after the proposed undertaking, its estimated market value after compliance with the determinations of the Commission, and the amount paid for the property. Metro Code § 17.40.420(D)(3), (5). The Commission may also consider any other information necessary to determine whether the property "does yield or may yield a reasonable return to the owners." Metro Code § 17.40.420(D)(7).

own figures, it stands to lose nearly $700,000 without approval of the permit.  The grant of a demolition permit based on economic hardship is permissive in nature; however, the Commission's decision must still be supported by material evidence which "exceed[s] a scintilla of evidence." *See Leonard Plating*, 213 S.W.3d at 904.  The Commission made no findings and did not present any material evidence upon which a reasonable person could rely to reach a rational decision that Byron did not suffer an economic hardship.  *See id*.  We therefore conclude that the Commission's decision is an arbitrary one.  *See id.*

The trial court also concluded that Commissioner DeCuyper should have abstained from voting, but that the outcome would not have changed if he had abstained.  This court is guided by the following principles regarding the disqualification of board members:

> Individual board members are subject to disqualification for bias if their impartiality can reasonably be questioned.  To amount to grounds for disqualification, a board member's bias must take one of three forms: (1) personal interest bias (i.e., where the board members will either gain or lose fairly directly from the decision), (2) bias or prejudice against a party either as an individual or as a member of a group, and (3) bias stemming from the prejudgment of disputed fact issues that will prevent a board member from fairly and impartially weighing the evidence.

*Martin v. Sizemore*, 78 S.W.3d 249, 266 (Tenn. Ct. App. 2001) (citations omitted).

Byron insists that the emails exchanged between Commissioner DeCuyper and staff member Robin Zeigler prior to the Commission hearing on November 18, 2009, show that DeCuyper had already reached conclusions about Byron's showing of economic hardship.  An email from DeCuyper to Zeigler on November 10, 2009, states the following:

> Take a look at the attached.  There are several options of much Higher Price Condo's in the West End Area, the only issue is with sales being very slow at this time wwe [sic] have very few comparable sales to compare.  I tried to look at only mid rise not high rise properties and developments within 1 mile + or - of the Ransom School site.  When you look at all of the higher end product that is on the market it makes it clear that they are trying to undersell their property value ie devalue the possible worth of the units.  I can do full printouts of the ones that you may want to use and wuold [sic] prefer to crop out my name from the searches.

The documents attached to this email were incorporated into the staff's report to the commissioners.

-13-

While the Commission is free to rely on the expertise of its members, the commissioners may not engage in any "conduct that would undermine the fairness of the proceeding." *Id.* We find that DeCuyper's hand selection of comps to include in the staff report to his peers and his failure to disclose that action undermine the fairness of the hearing.[7] These acts "would cause a reasonable person to question the [Commission's] impartiality." *Id.*

Byron argues that exceptional circumstances exist such that this court should compel the Commission to issue the permit rather than remand for reconsideration. We do not believe Byron has demonstrated that the Commission is unable to provide a fair hearing devoid of arbitrariness. We therefore follow the more general rule:

> Because courts should avoid requiring local zoning authorities to take a particular action except in the most extraordinary circumstances, the most common judicial remedy in zoning cases is to remand the case to the zoning agency with instructions appropriate to the circumstances of the case. Rather than shouldering the local agency's responsibilities, the courts should insist that the agency carry out its task in an appropriate manner. The goal of a remand should be to place the parties and the agency in the position they would have been in had the agency not acted improperly.

*Hoover, Inc. v. Metro. Bd. of Zoning Appeals for Davidson County*, 955 S.W.2d 52, 55 (Tenn. Ct. App. 1997) (citations omitted).

---

[7] This court has previously discussed an administrative agency's reliance on its own expertise:

> One of the principal reasons for the creation of administrative agencies is the expectation that the agency members will bring substantive expertise to the matters within their jurisdiction. Thus, the expertise of members of administrative boards and commissions plays a central role in administrative proceedings. Agencies are not lay juries, and, therefore, they are permitted to rely on their expertise in evaluating the evidence submitted to them as long as they disclose that they are doing so.
>
> However, a board's or agency's findings must be based on evidence presented to them. Courts should decline to accept agency findings that are not supported by evidence simply because the findings were made by experts. Accordingly, this court has held that members of boards and agencies cannot rely on their own expertise as a substitute for expert testimony that should have been presented during the hearing because doing so seriously compromises the fairness of the administrative proceeding.

*Leonard Plating Co.*, 213 S.W.3d at 906 (citations omitted).

We believe the most appropriate remedy is to remand the case to the Commission with instructions to conduct a new hearing. The new hearing shall be based on the existing record supplemented with any additional information Byron or the Commission staff might submit which the Commission deems appropriate of consideration. In view of the fact that the record contains a staff report based on Commissioner DeCuyper's input, Commissioner DeCuyper will not be permitted to participate in the Commission's decision or any staff report that may be prepared.

CONCLUSION

The decision of the trial court is vacated and the case is remanded to the trial court with instructions to return the case to the Metropolitan Historic Zoning Commission for further action consistant with this opinion. Costs of appeal are assessed against the appellee, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE