IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 22, 2013 Session

**BRAD BLEVINS v. CITY OF BELLE MEADE, TENNESSEE
BY AND THROUGH ITS BOARD OF ZONING APPEALS**

**Appeal from the Chancery Court for Davidson County**
**No. 12-596-IV    Russell T. Perkins, Chancellor**

---

**No. M2013-00268-COA-R3-CV - Filed November 25, 2013**

---

After receiving a stop-work order, a property owner petitioned the City of Belle Meade Board of Zoning Appeals for a declaration that a nearly completed structure on his property constituted an accessory use as a children's playhouse under the city's zoning code. After a hearing, the Board denied the request and the property owner filed a petition for a writ of certiorari seeking court review; the trial court affirmed the Board's denial. We concur with the trial court and affirm the Board's action.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P. J., M. S., and ANDY D. BENNETT, J., joined.

Shawn R. Henry, Nashville, Tennessee, for the appellant, Brad Blevins.

James L. Murphy and Eric W. Smith, Nashville, Tennessee, for the appellee, City of Belle Meade, Tennessee, by and through its Board of Zoning Appeals.

**OPINION**

**I. FACTS & PROCEDURAL HISTORY**

In October 2011, Brad and Kim Blevins began constructing a structure behind their home in the City of Belle Meade to be used as a playhouse for their three children. On December 1, the Blevins' contractor, Mike Hudson, was advised by Belle Meade's City Building Official, Terry Franklin, to stop work on the structure; later that week, Mr. Franklin issued a stop-work order in accordance with the Belle Meade Zoning Code (the "Zoning Code"). Mr. Blevins' counsel wrote counsel for the City requesting the reason the stop-work

order was issued. In response, the City's counsel explained that the order was issued because of concerns as to whether the structure constituted a "playhouse" under § 14-202(1)(b)(vi) of the Zoning Code.[1]

The Blevins appealed the stop-work order to the Board of Zoning Appeals (the "BZA"), which held a public hearing; at the close of the hearing, the chair of the BZA moved to "deny this structure as an accessory use under the building code" and all board members voted in favor of the motion.

Mr. Blevins petitioned the chancery court for a writ of certiorari requesting that the court "reverse the decision of the [BZA] and order a writ of mandamus to the [City of Belle Meade] to issue the appropriate permit, if one is required, and otherwise to allow [Mr. Blevins] to complete construction of the playhouse for its intended use." The court concluded that there was "sufficient material evidence in the record to support the [BZA's] determination that the Structure is not a qualified children's playhouse under § 14-202(1)(b)(vi) of the Zoning Code"; that the BZA "did not act illegally, arbitrarily, or fraudulently"; and that Mr. Blevins was "not entitled to equitable estoppel against the [BZA]." The court, accordingly, affirmed the decision of the BZA.

Mr. Blevins appeals, raising the issue of whether the trial court erred in affirming the decision of the BZA.

## II. STANDARD OF REVIEW

The vehicle for reviewing decisions of local boards of zoning appeals is through common law writ of certiorari. *Hoover, Inc. v. Metro. Bd. of Zoning Appeals of Davidson Cnty.*, 955 S.W.2d 52, 54 (Tenn. Ct. App. 1997). Under the limited standard of review in such proceedings, courts review the lower tribunal's decision only to determine whether that decision maker exceeded its jurisdiction, followed an unlawful procedure, acted illegally, arbitrarily, or fraudulently, or acted without material evidence to support its decision. *Petition of Gant*, 937 S.W.2d 842, 844–45 (Tenn. 1996) (quoting *McCallen v. City of Memphis*, 786 S.W.2d 633, 638 (Tenn. 1990)); *Fallin v. Knox Cnty. Bd. of Comm'rs*, 656 S.W.2d 338, 342–43 (Tenn. 1983); *Hoover Motor Exp. Co. v. R.R. & Pub. Util. Comm'n.*, 261 S.W.2d 233, 238 (Tenn. 1953); *Lafferty v. City of Winchester*, 46 S.W.3d 752, 758–59 (Tenn. Ct. App. 2001); *Hoover, Inc.*, 955 S.W.2d at 54; *Hemontolor v. Wilson Cnty. Bd. of Zoning Appeals*, 883 S.W.2d 613, 616 (Tenn. Ct. App. 1994).

---

[1] The letter stated that "[w]hile playhouses are permitted as an Accessory Use under the Zoning Code, the question of whether the structure at issue is diminutive in size and scale and designed for use as a playhouse, as defined by the Code, requires a factual determination by the Board of Zoning Appeals."

Under the certiorari standard, courts may not (1) inquire into the intrinsic correctness of the lower tribunal's decision, *Arnold v. Tenn. Bd. of Paroles*, 956 S.W.2d 478, 480 (Tenn. 1997); *Powell v. Parole Eligibility Review Bd.*, 879 S.W.2d 871, 873 (Tenn. Ct. App. 1994); (2) reweigh the evidence, *Watts v. Civil Serv. Bd. for Columbia*, 606 S.W.2d 274, 277 (Tenn. 1980); *Hoover, Inc. v. Metro. Bd. of Zoning Appeals*, 924 S.W.2d 900, 904 (Tenn. Ct. App. 1996); or (3) substitute their judgment for that of the lower tribunal. *421 Corp. v. Metro. Gov't of Nashville*, 36 S.W.3d 469, 474 (Tenn. Ct. App. 2000). "[T]he court's primary resolve is to refrain from substituting its judgment for that of the local governmental body." *McCallen*, 786 S.W.2d at 641; *See Capps v. Metro. Gov't of Nashville and Davidson Cnty.*, No. M2007-01013-COA-R3-CV, 2008 WL 5427972, at *5 (Tenn. Ct. App. Dec. 31, 2008) ("In recognition of the policy that favors permitting the community decisionmakers closest to the events to make the decision, the courts refrain from substituting their judgments for the broad discretionary power of the local governmental body.").

This Court's review of the evidence on appeal is no broader or more comprehensive than the trial court's review. *Watts v. Civil Serv. Bd. for Columbia,* 606 S.W.2d 274, 277 (Tenn. 1980); *Jacks v. City of Millington Bd. of Zoning Appeals*, 298 S.W.3d 163, 167 (Tenn. Ct. App. 2009). Application of a statute or ordinance to the facts is a question of law that is properly addressed to the courts. *Sanifill of Tenn., Inc. v. Tenn. Solid Waste Disposal Control Bd.*, 907 S.W.2d 807, 810 (Tenn. 1995). As to issues of law, our review is *de novo*, with no presumption of correctness. Tenn. R. App. P. 13(d); *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

## III. ANALYSIS

### A. Does the Structure Qualify as an Accessory Use

As an initial matter, we address Mr. Blevins's assertion that this Court cannot determine if there is evidence to support the BZA's decision because the reason for the denial was not specified in the meeting minutes. We have reviewed the transcript of the hearing which shows ample discussion of the facts which served as the basis for the BZA's decision. The motion stated that the structure was denied as an accessory use under the building code, rather than the Zoning Code. However, all discussions regarding the structure—including the correspondence between the Blevins' counsel and counsel for the City prior to the hearing and all testimony and discussions during the hearing—referenced the Zoning Code, rather than the building code. It is clear that the chair misspoke in making the motion and that the Blevins' request was denied because the structure did not qualify as an accessory use based on the Board's determination that it was not "diminutive in scale and design" as

required by Zoning Code § 14-202(1)(b)(vi). Accordingly, we resolve this issue under the Zoning Code.

We next address whether the record supports the BZA's determination that the structure does not qualify as an accessory use under Belle Meade Zoning Code § 14-202(1)(b)(vi). Mr. Blevins asserts that the Zoning Code's requirement that a playhouse must be "diminutive in scale and design" is "ambiguous and arbitrary" and that the criteria for regulating the height, roof pitch, or exterior material are not contained in the Code." He also contends that "[t]here was no evidence whatsoever upon which the Belle Meade BZA could reasonably rely, much less weigh, against the material evidence supplied in the administrative record by Mr. Blevins and his experts."

This Court discussed our role in evaluating the interpretation of zoning ordinances in *Brunetti v. Board of Zoning Appeals of Williamson County*:

> The interpretation of a zoning ordinance and its application to a particular set of facts are, in the first instance, questions for decision by local officials. Courts are hesitant to interfere with decisions by local zoning officials unless clearly necessary and will not substitute their judgment for that of the local zoning officials. *See Hoover*, 955 S.W.2d at 54 (citing *McCallen*, 786 S.W.2d at 639); *Whittemore v. Brentwood Planning Comm'n.*, 835 S.W.2d 11, 15 (Tenn. App. 1992). However, while courts may defer to local officials' interpretations where the interpretation is fairly debatable and the ordinance is ambiguous, they will set aside an interpretation which is arbitrary and capricious, contrary to the drafters' intent, or which undermines the ordinance's validity. *Whittemore*, 835 S.W.2d at 16.

> We interpret these and other relevant authorities to mean that our role is not to provide the initial interpretation of the Ordinance. . . . If the Ordinance may reasonably be interpreted more than one way, we will not substitute our judgment of the more preferable interpretation as long as the board's choice has a reasoned basis.

*Brunetti v. Bd. of Zoning Appeals of Williamson Cnty.*, 01A01-9803-CV-00120, 1999 WL 802725 (Tenn. Ct. App. Oct. 7, 1999). When the language of an ordinance is clear, courts will enforce the ordinance as written; when the language of an ordinance is ambiguous, however, courts will resort to principles of statutory construction. *421 Corp. v. Metro. Gov't of Nashville & Davidson Cnty.*, 36 S.W.3d 469, 475 (Tenn. Ct. App. 2000). Applying those principles, the fact that Zoning Code § 14-202(1)(b)(vi) does not contain criteria for determining whether a structure is "diminutive in scale and design" does not make the

provision ambiguous or its interpretation by the BZA arbitrary, particularly when considered in light of the entirety of Title 14 of the City Code.

Title 14, "Zoning and Land Use Control," is composed of four chapters which create and designate the powers of the Municipal Planning Commission (Chapter 1), set forth the Zoning Code (Chapter 2), adopt a flood damage prevention ordinance (Chapter 3), and adopt a stormwater ordinance (Chapter 4). Chapter 2, *inter alia*, defines the permitted and prohibited uses of property, establishes area, set-back, yard, height and parking requirements for buildings and structures, and establishes the BZA and grants its powers. Section 202 sets forth the permitted residential uses for property, which include accessory uses "customarily incident" to residential uses. Considered in context § 14-202(1)(b) shows a clear intent to establish standards for buildings which are not attached to the principal residence.

Consistent with this intent, Zoning Code § 14-202(1)(b)(vi) states:

> Uses. No building, structure, premises or site shall be used or arranged to be used except as provided below:
> (1) Residential uses. The following residential uses are permitted:
> * * *
> (b) Accessory uses. Accessory uses customarily incident to the above permitted uses, but not including the conduct of a commercial enterprise, business, or industry. Such uses shall include, but not be limited to the following:
> * * *
> (vi) Children's playhouses and/or tree houses without plumbing or electrical wiring, not to exceed one hundred (100) square feet in floor space, and diminutive in scale and design, and similar children's recreational facilities; provided they are to the rear of the dwelling and are at least ten (10) feet from the rear and side lot lines.

The structures which are included as "accessory uses" and which are not required to be attached to the principal residence are "arbors, pergolas and gazebos," dog houses, and children's playhouses (as described above). There is a minimum set back from the rear and side lot lines and a maximum square footage for each such structure. As used in the Zoning Code, the term "diminutive in scale and design" has a unique and specific meaning when applied to a children's playhouse; other language in the section that the provision applies to "similar children's recreational facilities" sets out a standard with which to judge the structure. This is sufficient guidance in the interpretation of the ordinance and it is not

necessary that specific criteria for the height, roof pitch, or exterior material be contained in the Code, as contended by Mr. Blevins. The record before us shows that the BZA considered the structure's height, material composition, and appearance, traditional indicia of the nature of a structure; this demonstrates that the BZA had a reasoned basis for its interpretation of the ordinance. The BZA's reliance on these factors was not arbitrary and capricious.

In *Heyne v. Metropolitan Nashville Board of Public Education*, our Supreme Court defined the nature and quantum of evidence needed to uphold a board's decision under certiorari review:

> For the purpose of this inquiry, "material evidence" is relevant evidence that a reasonable person would accept as adequate to support a rational conclusion. *Hedgepath v. Norton*, 839 S.W.2d 416, 421 (Tenn. Ct. App. 1992) (quoting *Pace v. Garbage Disposal Dist.*, 54 Tenn. App. 263, 267, 390 S.W.2d 461, 463 (1965)). The amount of material evidence required to support an agency's decision "must exceed a scintilla of evidence but may be less than a preponderance of the evidence." *Leonard Plating Co. v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 213 S.W.3d at 904.

*Heyne v. Metro. Nashville Bd. of Pub. Educ.*, 380 S.W.3d 715, 738 (Tenn. 2012).

The parties submitted evidence regarding the nature of the structure, including photographs of the partially completed structure, architectural plans for the main house and the structure, a gardening plan for the area around the structure, and Mr. Farris' letter regarding the architectural design of the structure. The evidence also included letters from neighbors in support of the Blevins, correspondence between Belle Meade officials and counsel for the Blevins, invoices showing a total of $31,705.91 being expended prior to the issuance of the stop-work order, and testimony and documentary evidence that the structure incorporated design elements such as a custom wood door, a stone exterior, a slate roof, and copper gutters; counsel for the Blevins represented that the total cost of the structure was to be $40,712. A drawing of the structure was included in Mr. Farris' letter, along with his statement that the structure had an overall building height of 14'-4"; a front door with a height of 6'-4"; and a ridge height that did not exceed the lowest roof line of the Blevins' residence. In the letter, Mr. Farris opined that the structure was diminutive in scale and design in comparison to the main residence, but he acknowledged that Mr. Franklin had expressed reservations regarding whether the structure could be characterized as a playhouse under the Zoning Code.

Mr. Franklin testified regarding his reservations about the structure:

> [Mr. Farris] came to me originally and submitted a set of draw- - - well, he brought in a set of drawings. We sat down and looked at it. I told [Mr. Farris], I said, "I don't think that I can justify that that's a playhouse." Too tall, you know. It didn't look like a playhouse to me; it looked more like a garden shed.
>
> We talked about what could be done, and I told him, I said, you know, you could lower the roofline; planter boxes; five foot door; take the stone off of it; you know, put stucco on it to match the house. Bring it down, bring the bulk of it down so that I could feel like I could justify to stand before this board, the mayor and commissioners, neighbors, and say that it was. That was the second time that we met when I suggested to change those changes, you know.
>
> At that point, after our second visit and they had still not – they had lowered it a little bit. They went from a seven foot door to a six-foot-four door, you know. And I made the suggestion of five foot and lower the roofline and take the stone off of it, you know, like that. I went on medical leave. And then when I come back, I saw it and just happened to be driving through the neighborhood and saw it. And then that's when we went through the procedure of, you know, hey, wait a minute; we need to stop for a second, look at this, and see what this really is.
> * * *
> [T]he last conversation I had with Ron about it before it got built was that I couldn't go along with it being anything other than a garden shed.

When he was asked if there were any other structures proposed on previous plans in the same location, Mr. Franklin stated:

> In the original plans, the design of the house before it was permitted, there was an area in that area where [the Blevins] had planned to put some garden areas . . . and there was a garden shed at that point. It may not be exactly the same spot, but there was a garden shed proposed. And it was outside the building envelope.
>
> I told the landscape architect . . . that that was a problem, that it was outside the building envelope. The board couldn't approve anything outside the building envelope, except for . . . what was permitted under the ordinance. And it was taken off originally . . .

There is material evidence in the record from which the BZA could determine that the structure was not diminutive in scale and design within those standards. The evidence included photos of the structure[2] as well as testimony regarding its material composition, including stone walls and a slate roof; its overall design which, according to Mr. Hudson, made the house appear to be one-and-a-half stories tall; and the overall height of the roof, door, and windows of the structure. Mr. Franklin also testified that the structure was too tall to be considered a children's playhouse under the Zoning Code and that he suggested before construction began that the stone exterior be removed from the design and stucco substituted consistent with the exterior of the house.

Given our narrow standard of review we are not to inquire into the intrinsic correctness of the board's decision, but rather only to determine whether there exists "relevant evidence that a reasonable person would accept as adequate to support a rational conclusion." *Hedgepath*, 839 S.W.2d at 421.[3] There was material evidence from which the BZA could conclude that the structure was not diminutive in scale, design, or both. [4]

## B. Vested Rights

Mr. Blevins contends that this Court should find that he "attained a legally protected vested property right" in part because he "acted in good faith reliance on the decisions of government employees—decisions that were confirmed by multiple inquiries" and because he "would suffer a substantial loss and expense if the City's decision is upheld resulting in

---

[2] A photo of the structure is attached in an appendix to this opinion.

[3] "Courts give wide latitude to local officials who are responsible for implementing zoning ordinances, are hesitant to interfere with zoning decisions, and will refrain from substituting their judgments for that of the local governmental officials." *State ex rel. Moore & Assocs., Inc. v. W.*, 246 S.W.3d 569, 575 (Tenn. Ct. App. 2005).

[4] Mr. Blevins also contends that the members of the BZA improperly relied on their own expertise in making their determination; Mr. Blevins does not provide a factual basis for this assertion. In any event, this Court has stated:

One of the principal reasons for the creation of administrative agencies is the expectation that the agency members will bring substantive expertise to the matters within their jurisdiction. Thus, the expertise of members of administrative boards and commissions plays a central role in administrative proceedings. Agencies are not lay juries, and, therefore, they are permitted to rely on their expertise in evaluating the evidence submitted to them as long as they disclose that they are doing so.

*Leonard Plating Co. v. Metro. Gov't of Nashville & Davidson Cnty.*, 213 S.W.3d 898, 906 (Tenn. Ct. App. 2006). These principles apply equally to boards of zoning appeals.

the forced demolition of a substantially completed structure." The record does not support his argument that he obtained a vested right in order to complete the structure.

In the context of zoning, a landowner acquires vested rights to develop when: "(1) relying in good faith, (2) upon some act or omission of the government, (3) he has made substantial changes or otherwise committed himself to his substantial disadvantage prior to a zoning change." *CK Dev., LLC v. Town of Nolensville*, M2010-00633-COA-R3CV, 2012 WL 38287 (Tenn. Ct. App. Jan. 6, 2012). Without a contrary statutory provision, "the majority of states, including Tennessee, require issuance of a building permit, plus substantial construction and/or expenditures, before a right to develop vests." *Id.* (citing 4 Am. Law Zoning § 32:3 (5th ed.)).

Mr. Blevins did not obtain a building permit for the structure; such a permit is a threshold requirement to obtain a vested right under Tennessee law. Although Mr. Blevins contends that his "good faith reliance" on the assurances of city officials was sufficient to establish a vested right, the evidence does not support this assertion.

Mr. Hudson testified that a building permit was not required for the construction of a children's playhouse, but that Phil Buma, the City Building Inspector, came and inspected during the initial stages of construction and approved the "location and size of the footprint." Mr. Hudson also testified that Mr. Buma came out a second time to inspect the framing of the structure. Mr. Buma testified that he only inspected the foundation of the structure, and did not inspect a second time. While Mr. Buma approved the footprint of the structure as being less than 100 square feet, this approval was insufficient, in light of Mr. Franklin's repeated statements and reservations to Mr. Blevins' architect that the structure would not qualify as a children's playhouse under the Zoning Code, to constitute an "act or omission" upon which Mr. Blevins could rely in committing to the construction of the structure. Moreover, there is no evidence that the City changed any advice or approval it had previously given Mr. Blevins during the course of construction; indeed, the evidence is to the contrary.

## IV. CONCLUSION

For the foregoing reasons the judgment of the trial court is affirmed.

_____
RICHARD H. DINKINS, JUDGE

-9-

Appendix

