IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 22, 2018 Session

## JOSHUA KELLER v. JANICE CASTEEL, ET AL.

**Appeal from the Chancery Court for Bradley County**
**No. 2012-CV-117      Jerri Bryant, Chancellor**

_____

## No. E2017-01020-COA-R3-CV

_____

This action involves the petitioner's termination of employment as a firefighter for the City of Cleveland. The petitioner filed a petition for writ of certiorari and sought partial summary judgment, alleging, inter alia, that the termination procedure was unlawful. The trial court agreed and granted partial summary judgment. The case proceeded to a hearing on damages, after which, the court found that the petitioner failed to exercise reasonable diligence in securing employment. The petitioner filed a motion to alter or amend. The court then altered its original order and held that material evidence existed in the record to support the termination decision, reversing the order for partial summary judgment and dismissing the action. The petitioner appeals. We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Reversed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR. and THOMAS R. FRIERSON, II, JJ. joined.

James R. McKoon, Chattanooga, Tennessee, and Sarah M. Block, Washington, D.C., for the appellant, Joshua Keller.

Ronald D. Wells, Stacy Lynn Archer, and Philip Aaron Wells, Chattanooga, Tennessee, for the appellees, Janice Casteel, Steve Haun, and the City of Cleveland.

## OPINION

### I.      BACKGROUND

On December 1, 2008, Joshua Keller ("Petitioner") was hired by the City of Cleveland to serve as a firefighter. During the course of his employment, Petitioner was convicted of two criminal offenses, namely driving under the influence in 2009 and

simple assault in 2012. Petitioner was not working when the events giving rise to his convictions occurred. Following the 2012 incident, Petitioner was suspended from his employment pending the resolution of his criminal charges. Petitioner was initially charged with two counts of aggravated assault and one count of reckless endangerment arising from an altercation in which he fired his handgun in the air while inebriated. Petitioner ultimately pled to a misdemeanor charge of simple assault and paid a $25 fine.

Petitioner informed his Fire Chief, Steve Haun ("Chief Haun"), that his criminal charges had been resolved. Chief Haun then met with City Manager Janice Casteel ("the City Manager") and others to consider Petitioner's continued employment. Thereafter, Chief Haun filed a memorandum with the City Manager in which he recommended Petitioner's termination. The City Manager, who held the exclusive authority to terminate employment, then terminated Petitioner's employment. Petitioner was given a disciplinary action report that cited his conviction of a criminal offense and disgraceful personal conduct as reasons for his termination.

On February 14, 2012, Petitioner requested an appeal hearing with the City Manager, pursuant to the Cleveland City Government Personnel Manual ("the Manual"). His appeal was heard on March 1, 2012, with the City Manager presiding. Chief Haun testified that he had served as acting chief for approximately ten months and that Petitioner's case was his first disciplinary investigation. He identified his memo to the City Manager, dated February 8, 2012, which provided, in pertinent part, as follows:

> [Petitioner's] application indicates he had some prior misdemeanors when he was younger. Despite these offenses, he was hired on December 1, 2008. During his 6 month probation period in 2009, he was convicted of a DUI violation while off duty. At that time we met with his supervisors and they felt he was worth salvaging. We requested that he get counseling for alcohol abuse. [Petitioner] did attend counseling sessions in Cleveland as well as Chattanooga. [Petitioner] had his probation period extended 12 months and had been without a conviction of a crime until the incident on Jan. 22, 2012.

> [Petitioner] has a good work history according to his evaluations and supervisors. He has completed every certification and all training that is required to keep his employment. He also works well in a team unit.

> Although his supervisors still feel he is worth saving as an employee, I have to make the decision that is best for our Department as a whole.

I cannot, as Fire Chief, condone this behavior from a firefighter of this department. I have to think of the precedent that will set if I allow [Petitioner] to return. I would have to allow this type of behavior from the rest of the department as well as future employees and I am not prepared to lower our standards as a department to do what is easy. I feel that [Petitioner] was shown compassion in 2009 and was allowed to continue to work for the City of Cleveland.

I still have compassion for [Petitioner] and what dismissal will mean for his life. But I keep coming back to the realization that [Petitioner] made every decision, as poor as they were, to put himself in this position. Therefore, it is my recommendation of dismissal.

Chief Haun explained at the appeal hearing that his recommendation for termination was based upon Petitioner's history of behavior, not a specific incident. He noted that Petitioner also reported a few alcohol-related misdemeanors committed while he was a juvenile in his application for employment and further explained,

I'm just saying that we have a pattern set in his application. While he was under our six-month probation period at that time, which has now been extended to 12 [months], but in that first six-month period, we have the same behavior again, alcohol-related incident. And then less than a year out of his 12-month probation that we extended, we're back to an alcohol-related incident.

It's not anything that he was charged with or anything that he's been convicted of, per se. It's just that pattern of behavior.

* * *

I felt as a [Chief and as a department head] that there has to be a certain level of integrity on and off of the job, and I felt that if we continued allowing that type of behavior off the job, that we would be setting ourselves up for problems down the road if we had some type of accident or anything that he was involved in, for himself and the City.

Chief Haun agreed that Petitioner's supervisors believed he was an excellent firefighter and indicated that they did not want him dismissed. He further acknowledged that determinations regarding whether an employee had engaged in disgraceful personal conduct were subjective and not measured against a set standard of behavior.

Lieutenant Matthew Ford testified that he has served as Petitioner's direct supervisor for approximately two years. Lieutenant Ford confirmed that Petitioner performed well as a firefighter, was eager to learn, and was respectful of his position.[1] He denied any problems with Petitioner's performance under his supervision. He provided that he was not consulted concerning the decision to terminate Petitioner's employment and indicated that he would welcome him back if Petitioner were reinstated.

Petitioner testified that he was arrested on January 22 following an altercation that occurred at his home. He claimed that he was not involved in the initial fight but that he became involved in an attempt to stop the disruption. He admitted that he retrieved his weapon and shot into the air when the two involved in the altercation came toward him. He admitted that everyone had been drinking and that he had consumed eight drinks in a period of approximately five hours before the altercation that led to his arrest. He expressed remorse for his actions and stated that if presented with the same situation, he would call for police assistance instead of discharging his firearm. He claimed that he has not consumed alcohol since the incident and has enrolled in a program that has aided him in his efforts to abstain from alcohol.

By letter, dated March 20, 2012, the City Manager advised Petitioner of her decision to uphold his termination. On May 11, 2012, Petitioner filed a petition for writ of certiorari in the Chancery Court of Bradley County. The City Manager, Chief Haun, and the City of Cleveland (collectively "Respondents") were listed as respondents to the petition. Petitioner alleged violations of the Uniform Administrative Procedures Act ("UAPA") and procedural due process violations. The trial court granted the petition and issued a writ of certiorari, directing Respondents to return a complete record of the termination proceedings at issue.

Petitioner then sought to amend his petition to include federal claims. The court granted the motion, and the case was removed to the United States District Court for the Eastern District of Tennessee. The District Court granted summary judgment in favor of Respondents and remanded the remaining state law claims back to the Chancery Court.

Upon remand, Petitioner filed a motion for partial summary judgment in which he alleged, inter alia, that Respondents utilized an unlawful procedure in terminating his employment. The court granted partial summary judgment, by order dated May 29, 2015. The court held that the procedure utilized was unlawful and that Petitioner was denied due process when (1) the City Manager served in an adjudicative capacity to review her own termination decision and (2) when the City Manager relied upon evidence not placed in the record to affirm her termination decision. The court held that

---

[1] Joseph Black Akins, an engineer who worked with Petitioner, confirmed these facts as well.

the review utilized did not conform to the judicial review standards under the UAPA. The court continued that jurisdiction to review the procedure utilized was also afforded through the common law writ of certiorari, which limited review to whether the entity (1) exceeded its jurisdiction; (2) followed an unlawful procedure; (3) acted illegally, arbitrarily or fraudulently; or (4) acted without material evidence to support its decision. The court alternatively held that Respondents also failed to follow a lawful procedure pursuant to the common law writ of certiorari.

Respondents moved to alter or amend the order and alternatively requested interlocutory review pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. The court granted the request for interlocutory appeal and further amended its order as follows:

> [T]he court clarifies its original Order to hold that the court considered this case on the common law writ of certiorari and determined that the procedure used by the City of Cleveland was unlawful. It is undisputed that the City Manager made the initial decision to terminate [Petitioner]. The City of Cleveland then provided an appeals process whereby [Petitioner] had to appeal his termination to the same decision maker who was involved in and made the initial decision to terminate his employment. That procedure, along with the City Manager requesting ex parte documentation, clearly indicates that the City Manager had the role of investigator and fact finder. The court further clarifies it made no finding that the handbook creates a contract but outlines the procedure for appeal by employees who are terminated by the City of Cleveland.

Upon consideration of the application for permission to appeal to this court, we dismissed the application and granted attorney fees in favor of Petitioner.

Upon remand, Petitioner argued that he has incurred a significant amount of damages in back pay and front pay as a result of his wrongful termination and requested damages in excess of $1 million. Respondents claimed that any damages allegedly due should be reduced because Petitioner failed to mitigate his damages by obtaining suitable employment. The case proceeded to a hearing, at which several witnesses testified. Lieutenant Ford confirmed his earlier testimony praising Petitioner's efforts while employed and agreed that Petitioner could have potentially served as a career firefighter if not for his termination. He acknowledged that Petitioner had not requested a recommendation since termination but agreed that while not prohibited from providing a reference, references are ordinarily obtained through the Office of Human Resources. He stated that he would have given a reference or referral, if asked.

Lieutenant Joseph Akins testified that he first met Petitioner when Petitioner enrolled in the firefighter program. He confirmed Petitioner's competency and enthusiasm as a firefighter and agreed that Petitioner could have potentially served as a career firefighter if not for his termination. He also agreed that he would have provided a reference, if asked.

Becky Keller, Petitioner's wife, testified concerning the affect the termination had on Petitioner and their marriage. She claimed that Petitioner loved his job as a firefighter and appreciated the schedule that allowed him to exercise co-parenting time with his daughter, her stepdaughter. She stated that she assisted him in his efforts to obtain employment following his termination and provided that he submitted applications for employment to the fire departments in Bradley County, Athens, and the City of Chattanooga in 2012. She claimed that he did not receive any responses from his applications. She stated that he then applied for employment with HEPACO and actually interviewed with the company but did not receive an offer of employment. She provided that Petitioner then focused his efforts on construction and remodeling, a field he worked in on his time off while still employed as a firefighter. She claimed that he even pursued HVAC certification to expand his construction business and that he currently works 12-hour days in construction when not exercising co-parenting time with his daughter.

Petitioner, who was 34 years old at the time of the hearing, testified that his desire was to serve as a career firefighter prior to his termination. He explained that he loved his job and the comradery with his co-workers. He claimed that he was doing "really good" as a firefighter and never received any complaints concerning his job performance. Relative to income, he claimed that he received $37,757.13 in 2011 and $7,748.14 prior to his termination in 2012.

Petitioner stated that he submitted three applications for employment in his field at different fire departments. He did not receive any responses. He confirmed that he interviewed with HEPACO but did not receive an offer of employment. He then enrolled in school to obtain HVAC training for his construction business. He stated that he borrowed $10,000 to complete the courses required, after which he continued in the construction business and completed service calls using his HVAC training. He also obtained a job doing HVAC maintenance for 22 or 25 rental units. He explained that he was "doing a little bit of everything: roofing, heat and air, plumbing, everything." He provided that his income from his construction business was $14,400 in 2014 and $11,064 in 2015. He also no longer has benefits, paid holidays, or paid overtime.

Petitioner stated that his firefighter certifications were no longer valid. He acknowledged that he did not ask his former supervisors for a reference when completing his applications for the fire departments. He denied ever receiving a notice advising him

that his application for the City of Chattanooga was incomplete. He agreed that he did not contact the fire departments to inquire further concerning the status of his applications. He also did not contact HEPACO concerning the status of his application. He stated that he did not apply for employment with an HVAC company because he did not want to jeopardize his co-parenting schedule with his daughter.

John McKinney, a vocational evaluator, testified that he evaluates a person's ability to work and earn wages and has previously testified as a vocational expert in Tennessee in worker's compensation or personal injury cases. He stated that in this case, he examined Petitioner's potential loss of earning capacity as a result of his termination and researched employment opportunities available to Petitioner. He stated that following his examination, he determined that there was not a reasonable expectation for Petitioner to obtain employment as a firefighter given the fact that he had not received any responses from his application and that he could not get a personal or occupational reference from the City of Cleveland. He noted that it had also been approximately four years since Petitioner had performed in that field. He believed that a vocation in the carpentry or HVAC industry was a viable option given Petitioner's prior work history and subsequent HVAC training. He stated that the average entry level wage in the carpentry or HVAC field was approximately $25,432. He agreed that there was a potential for benefits but that there was little likelihood that he would obtain the same level of benefits he enjoyed while working for the City of Cleveland.

Mr. McKinney estimated that as a result of the termination, Petitioner experienced an annual loss of approximately $20,082, for a total loss of $90,369 over a four and half year period, not including benefits. He explained that the pay for an experienced firefighter was approximately $45,514, while the average entry level in the field of carpentry or HVAC was approximately $25,432. He provided that Petitioner's average annual loss would decrease as Petitioner obtained experience in his new field and earned a higher wage, namely between $35,200 and $36,200, representing the average range for an experienced worker. He estimated that Petitioner would then experience an annual loss of approximately $9,800, representing a future loss of earnings of approximately $253,820 over the course of his estimated work life expectancy of 25.9 years. He agreed that his estimation did not include any consideration of the value of benefits Petitioner lost as a result of termination.

Mr. McKinney acknowledged that Petitioner may not have received a response from his applications as a result of his criminal history or because there were more qualified applicants. He further agreed that someone who refused to work certain hours or days per week would reduce his or her access to the actual labor market. He estimated that there were approximately 250,000 jobs in the Cleveland-Chattanooga Metropolitan area, of which Petitioner likely had access to approximately 120,000 given his education,

cognitive, or physical limitations. He explained that of the 250,000 total jobs, there were likely only 9,000 actual job openings in the area, according to the Tennessee Department of Labor.

Eugene Bruce Hutchinson, Ph.D. testified he serves as a consultant in employment cases and typically calculates lost wage income plus fringe benefits. In this case, he calculated Petitioner's lost earnings as a firefighter for the City of Cleveland, plus the value of his fringe benefits. He then reduced Petitioner's estimated loss of income by his wages earned from the time of termination and by Mr. McKinney's estimate of the entry level wage income for an HVAC technician or carpenter and fringe benefits of the mandated employer contribution for Social Security and Medicare. He estimated that Petitioner's loss from the time of termination until the hearing was approximately $181,439, mitigated to account for the estimated wages earned as an HVAC technician or carpenter, plus fringe benefits. He estimated Petitioner's future loss was approximately $888,724, also mitigated.

William Alan Wray, Ed.D. testified by deposition that he is a Board certified professional disability consultant. In this case, he worked as a consultant to determine how a change in employment might affect future access to employment. He acknowledged that Petitioner may have trouble accessing employment as a firefighter. He continued,

> [M]y opinion there was based on two factors. One was, having been terminated, he might lack a positive recommendation from his former employer. Such recommendations are pretty key to landing those types of jobs, so I felt like that might limit him in accessing other fire-department work.
>
> The issue of whether he would be snagged on a criminal background check was also there. He has a remote - - in the remote past, a DUI; and he has this most recent charge for having discharged a gun in public. Both these are misdemeanor-type charges.
>
> But I felt, between the lack of having a positive reference and the fact that he would be eliminated from some employment would - - based on a background check, I felt he had lost access to some work.

He claimed that he then discovered "a very broad base of employment" available to Petitioner with some positions on an equal or higher level of pay than what he received as a firefighter.

Dr. Wray asserted that the US Bureau of Labor Statistics reported an annual mean wage of approximately $29,000 for firefighters in Tennessee and Georgia counties. He acknowledged that Petitioner reported income of approximately $38,000 while employed as a firefighter. He explained that he simply used data from the same source in formulating his opinion to avoid any distortion of the figures. He confirmed that the annual mean wage for someone in the carpentry or HVAC field was $33,000 and $39,000, respectively. He stated that while Petitioner's access to employment as a firefighter had been diminished, he nevertheless "enjoys very good access to a number of jobs in the local economy." He acknowledged that it would be reasonable for Petitioner to complete additional training for another field, namely HVAC training, once Petitioner determined he could not obtain employment in his prior field.

Dr. Wray claimed that there were approximately 30,000 employment positions in the Cleveland area and 100,000 positions in the Chattanooga area. He explained that these positions were not necessarily open postings but that they were positions that were reasonable for Petitioner to submit an application. He agreed that his analysis was of the current job market in 2016, not the market in existence at the time of Petitioner's termination in 2012. He further agreed that the unemployment rate was 7.5 percent in 2012, approximately 3 percent higher than the current rate of 4.3 percent in 2016.

Jeffrey Davis, a Human Resources Director for the City of Cleveland, testified that any requests for a reference would come through his office. He denied knowledge of any entity requesting a reference regarding Petitioner. He agreed that Petitioner's superiors were not prohibited from providing their own reference and that the current policy required his office to provide a neutral reference in cases where the employee at issue had been terminated from employment.

Chief Jim Dyer, the Fire Chief of the Fire Department for the City of Athens, testified that he never received an application for employment from Petitioner. He agreed that he could not attest that no document was ever received by Human Resources for Petitioner. Likewise, Tracy Cook, who works in the Human Resources Department for Bradley County, testified that she never received an application for employment from Petitioner and that she checked through her files and could not find an application from him in response to their advertisements for employment. She stated that unsolicited applications, meaning applications submitted not in response to an advertisement for employment, were only kept on file for six months. Shea Jefferson, a Resource Generalist for the City of Chattanooga, testified that applications for employment with the Fire Department must be completed through their online system. She confirmed receipt of an application from Petitioner on July 9, 2013, but stated that the system sent him a generic notice advising him to reapply because the application was incomplete. She stated that Petitioner did not provide complete addresses for the references listed on

his application. She provided that she never received a completed application from Petitioner. She agreed that she did not personally confirm that Petitioner received notice that his application was incomplete but that all correspondence was through the automated system.

Following the hearing, the court found that Petitioner failed to mitigate his damages and dismissed the case. Petitioner moved to alter or amend the court's order. The court then altered its original order and held that material evidence existed in the record to support the termination decision, reversing the original order for partial summary judgment and dismissing the action. In so holding, the court found that there was material evidence in the record to support the termination decision and upheld the decision pursuant to Section 4-5-322(i)[2] because "the errors complained of in this case d[id] not affect the merits." This appeal followed.

## II.    ISSUES

We consolidate and restate the issues on appeal as follows:

A.      Whether Petitioner was entitled to judicial review of his termination.

B.      Whether Petitioner is entitled to damages as a result of the alleged unlawful termination.

## III.    DISCUSSION

### A.

As a threshold issue, Respondents claim that Petitioner was never entitled to judicial review of the termination decision because he was an at-will employee without a protected property interest in his employment.[3] At the time of Petitioner's termination, the Manual provided as follows:

---

[2] "No agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affects the merits of such decision."

[3] Similarly, Petitioner argues that the court was without authority to review the *merits* of his termination. We agree; however, the trial court and now this court must determine whether Respondents acted arbitrarily, meaning without material evidence in terminating his employment. The court found that Respondents acted with material evidence, thereby obviating any need for reversal based upon a procedural error pursuant to Section 4-5-322(i). This is the actual finding at issue on appeal, along with the court's determination on the issue of damages.

Any City employee reprimanded, suspended, demoted, or dismissed *has the right* to submit a request in writing to the City Manager to have the action reviewed. An employee who chooses to appeal to the City Manager must submit the request for an appeal within two (2) working days of receipt of notification of the disciplinary action, and must state his/her intent to have representation, and to name the representative(s). The request must be in writing. The City Manager *shall* schedule a hearing within ten (10) working days of the receipt of the employee's written request for appeal. The action of the City Manager shall be final and binding on all parties involved *unless appealed to Chancery Court* by the employee. However, if the City Manager determines that procedures established by law were not followed by the appropriate Supervisor and/or Department Head, the decision of the City Manager shall be binding on all parties involved *unless appealed to Chancery Court* by the employee or the City. Any employee reprimanded, suspended, demoted or dismissed must timely request an appeal and complete the appeals process prior to filing an action in Chancery Court.

(Emphasis added.). Respondents argue that the Manual did not provide a contractual right to employment and that Petitioner had no protected interest in his continued employment as evidenced by the following provision also contained in the Manual:

The purpose of these policies is to establish a high degree of understanding, cooperation, efficiency, and unity among municipal government employees which comes from a systematic application of good procedure in personnel administration, and to provide uniform policies for all employees, with all the benefits such a program insures.

* * *

These policies nor any provisions herein are [not] an employment contract or any other type of contract. All employees of the City are employed for an indefinite term.

While the Manual did not expressly provide a right to continued employment, it provided all employees with the unequivocal right to an appeals process concerning said employment and further provided a corresponding right to judicial review of such decisions.

The Parties appear to agree that review in this case, if applicable, was through the common law writ of certiorari. The trial court first conducted its review under the

- 11 -

common law writ of certiorari in granting partial summary judgment.[4]  However, the court later relied upon the provisions of the UAPA in reversing its original order and upholding the decision pursuant to Section 4-5-322(i).  The contested case procedures of the UAPA are applied to cases falling within the scope of Section 27-9-114 for statutory writs of certiorari.  Review pursuant to a statutory writ of certiorari is available to "[a]nyone who may be aggrieved by any final order or judgment of any board or commission functioning under the laws of this state."  Tenn. Code Ann. § 27-9-101.  Respondent argues, and we agree, that there is no law that creates the procedures for the City of Cleveland.  Accordingly, Section 27-9-114 does not apply.

Our Supreme Court has held that "[i]f section 27-9-114 does not apply, then review is under the common law writ of certiorari."  *Tidwell v. City of Memphis*, 193 S.W.3d 555, 559-60 (Tenn. 2006).  *See* Tenn. Code Ann. § 27-8-101 ("The writ of certiorari may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board, or officer exercising judicial functions has exceeded the jurisdiction conferred, or is acting illegally, when, in the judgment of the court, there is no other plain, speedy, or adequate remedy.").  Judicial review under the common law writ is "limited to determining whether the [City Manager] exceeded its jurisdiction, followed an unlawful procedure, acted illegally, arbitrarily, or fraudulently, or acted without material evidence to support its decision."  *Harding Academy v. Metro. Gov't of Nashville & Davidson Cnty.*, 222 S.W.3d 359, 363 (Tenn. 2007).  Furthermore,

> Review under a common-law writ of certiorari does not extend to a redetermination of the facts found by the board or agency whose decision is being reviewed.  The courts may not (1) inquire into the intrinsic correctness of the decision, (2) reweigh the evidence, or (3) substitute their judgment for that of the board or agency.  However, they may review the record solely to determine whether it contains any material evidence to support the decision because a decision without evidentiary support is an arbitrary one.

*Leonard Plating Co. v. Metro. Gov't of Nashville and Davidson Cnty.*, 213 S.W.3d 898, 903-04 (Tenn. Ct. App. 2006) (internal citations and footnotes omitted); *see also Flowers v. Traughber*, 910 S.W.2d 468, 470 (Tenn. Ct. App. 1995) ("Not the correctness of the decision, but only the manner in which it was reached is reviewable.").  "This limited standard of review applies to both the trial court and to this [c]ourt."  *Abbington Center, LLC v. Town of Collierville*, 393 S.W.3d 170, 175-76 (Tenn. Ct. App. 2012).

---

[4] "[T]he court clarifies its original Order to hold that the court considered this case on the common law writ of certiorari and determined that the procedure used by the City of Cleveland was unlawful."

The Parties agreed for purposes of summary judgment that the City Manager held the exclusive authority to terminate Petitioner's employment and that she did so terminate his employment based upon Chief Haun's recommendation. She then reviewed her own termination decision in the hearing on appeal. Regardless of whether the City Manager acted with material evidence in support of her decision, the procedure utilized was unlawful because the person who made the termination decision also affirmed the same decision on appeal. Accordingly, Petitioner was entitled to relief and an assessment of damages pursuant to Section 27-8-117.[5]

"When an employee has been wrongfully terminated, the measure of damages is the amount the employee would have earned had the employer not dismissed him, less what would have been earned, or might have been earned, in some other employment, by the exercise of reasonable diligence." *Frye v. Memphis State Univ.*, 806 S.W.2d 170, 173 (Tenn. 1991). Further,

> While the employee may recover the loss of wages, there is a duty to minimize this loss by seeking other employment. The employee is not required to accept any offer of employment, or abandon his home or place of residence to seek other employment, but is only required to exercise reasonable diligence in seeking other employment of a similar or comparable nature. An employee is not required to go to heroic lengths in attempting to mitigate his damages, but only to take reasonable steps to do so. The burden is on the employer to establish that the employee failed to exercise reasonable diligence in mitigating damages. The employee is not required to mitigate damages by accepting a position that is not comparable or is, in effect, a demotion. It is the employer's responsibility to establish that equivalent positions are available with virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status.

*Id.* at 173 (internal citations and quotations omitted).

Here, Respondents' expert, Dr. Wray acknowledged that the pursuit of employment in Petitioner's current field would have been difficult given Petitioner's termination and criminal background. While Petitioner claimed that he submitted some applications in his current field, he primarily focused his efforts on his existing qualifications in the field of carpentry. He then added additional HVAC training to further the success of his construction business. According to Dr. Wray, the mean wage

---

[5] "On the final judgment, the court may, if the applicant obtain relief, direct the jury trying the cause to assess damages, or may impanel a jury for that purpose, may order restitution of the property, *or give such other judgment in the applicant's favor as the state of the case requires.*" (Emphasis added.).

for someone in the HVAC or carpentry business was comparable in nature and, in some cases, possibly higher than the mean wage available to a firefighter. With these considerations in mind, we hold that Petitioner exercised reasonable diligence in mitigating his damages by returning to a prior field of work with a similar wage and pursuing additional training to further the success of his business. Accordingly, we reverse the decision of the trial court and remand for calculation of damages.

## IV. CONCLUSION

The judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion. Costs of the appeal are taxed to the City of Cleveland.

_____
JOHN W. McCLARTY, JUDGE