IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 2, 2021

## KODI GAIL KNIGHT v. THE CITY OF FAIRVIEW, WILLIAMSON COUNTY, TENNESSEE

**Appeal from the Chancery Court for Williamson County**
**No. 49195      Joseph A. Woodruff, Chancellor**

---

### No. M2020-01433-COA-R3-CV

---

This appeal concerns a police officer's termination.  Kodi Gail Knight ("Knight") was a police officer for the City of Fairview, Tennessee ("Fairview").  After an August 2019 incident in which Knight struck a handcuffed woman ("the Arrestee")[1] in the face, Fairview police chief Zack Humphreys ("Chief Humphreys") submitted a request to City Manager Scott Collins ("the City Manager") that Knight be terminated.  The City Manager sent Knight a termination letter.  Knight requested, and was granted, a pre-dismissal hearing before the City Manager.  Following this hearing, the City Manager affirmed the decision to terminate Knight.  Knight filed a petition for writ of certiorari in the Chancery Court for Williamson County ("the Trial Court").  The Trial Court affirmed Fairview's termination of Knight.  Knight appeals, arguing among other things that his procedural due process rights were violated because the City Manager both drafted his termination letter and presided over his pre-dismissal hearing.  We find that Knight was an at-will employee who lacked a property interest entitling him to procedural due process protection.  We also find that the City Manager's decision was supported by substantial and material evidence and was neither arbitrary nor capricious.  We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S. and ARNOLD B. GOLDIN, J., joined.

Matthew R. Muenzen, Franklin, Tennessee, for the appellant, Kodi Gail Knight.

Timothy V. Potter, Dickson, Tennessee, for the appellee, the City of Fairview.

---

[1] We decline to use the arrested woman's name as it is unnecessary to do so.

# OPINION

## Background

On August 16, 2019, Knight participated in the Arrestee's arrest. The Arrestee, who had been driving erratically, was removed from her stopped vehicle and placed in handcuffs behind her back. While being walked toward a police cruiser by Knight and another officer, the Arrestee spat in Knight's face. In response, Knight hit the Arrestee in the face with an open hand. Knight followed up by grabbing the Arrestee's face and telling her not to spit on him again.

Chief Humphreys led an investigation into the incident, which had garnered public attention. Knight was placed on administrative leave. Ultimately, Chief Humphreys submitted a request to the City Manager that Knight be terminated for improper use of force and for misrepresenting the incident afterward. In accordance with Chief Humphreys' request, the City Manager sent Knight his Notice of Intended Dismissal and Termination of Employment, which was dated November 8, 2019. The termination letter stated that Knight was being terminated for violating Fairview Police Department General Rules Section 2.03(F) regarding Misrepresentation and Falsification ("No member shall, in an official capacity, knowingly misrepresent any matter, sign any false statement or report, commit perjury, or give false testimony before any court, grand jury, official hearing or departmental hearing."), and Chapter 4 Policy 4-01 Use of Force IV.F2(e) ("Force shall not be used against persons in handcuffs, except as objectively reasonable to prevent imminent bodily harm to the officer, third parties, the handcuffed person from themselves, or as objectively reasonable, where physical removal is necessary to overcome passive resistance."). The letter advised Knight that pursuant to the Fairview Employee Policies and Procedures Manual, Article XII, Section E, he had a right to a pre-dismissal hearing if he so chose.[2] Knight requested a pre-dismissal hearing.

On December 12, 2019, Knight's pre-dismissal hearing was held before the City Manager at the Fairview City Hall. Knight appeared and was represented by counsel. Both Chief Humphreys and Knight testified, the former first. Chief Humphreys had been Fairview's police chief for three years. He had twenty-one police officers in his department. According to Chief Humphreys, Knight had been a Fairview police officer

---

[2] Article XII, Section E provides, in part: "The purpose of dismissal hearing is to provide the basis for making a determination of whether the Department Head's decision to dismiss the employee was a reasonable one under the circumstances. Any employee who has received a notice of dismissal shall have the right to make a written request, to be submitted to the Human Resources Director within five (5) City business days of receipt of the notice of intended dismissal, for a pre-dismissal hearing with the City Manager. Affected employees will be placed on paid administrative leave…."

from around 2013. Knight was a patrol officer, day shift. Chief Humphreys testified to how he became aware of the August 16, 2019 incident involving Knight and the Arrestee:

> First, initially that day of the event I was in the squad room shortly after the event and Officer Knight come into the squad room and said to the effect of, Chief, we just had an incident, and I had to put my hands in a girl's face and push her face away keep her from spitting on me again, which I acknowledged no problem. That's all I knew about the case at the time -- this was a Friday I believe.
>
> Through the weekend apparently some witnesses to the scene started reaching out to the mayor and saying that possibly the girl was struck. I was in in-service the following week, so I wasn't present here, so the assistant chief spearheaded the initial investigation what is this versus, you know, what we thought it was. And they -- I don't know who all was present but he was contacting me back and forth by phone and said that both Kodi Knight and David Howell, which was the arresting officer for the DUI, which was he alone, were both being suspended administratively with pay. That's how that initial case come back.

Chief Humphreys was shown certain Affidavits of Complaint, which he testified were prepared by Officers Knight and David Howell ("Howell"). According to the affidavits, the Arrestee was arrested for driving under the influence third offense; resisting stop, halt, frisk; and driving on a suspended driver's license. Knight brought an assault charge against the Arrestee for spitting on him. Knight's affidavit mentioned the Arrestee's cursing and spitting at him, but did not mention that he struck her in the face. Chief Humphreys testified that when an officer makes an arrest, that officer must complete an incident report. Chief Humphreys was presented with a document he testified was prepared in part by Howell but supplemented by Knight. Chief Humphreys stated: "There was no mention of force or restraint of the head in the -- in the report. It simply says [the Arrestee] was placed in handcuffs and was escorted to the patrol car when she turned and spit in Officer Knight's face."

Video from Knight's car camera, which captured the incident, was played at the hearing. Chief Humphreys narrated what was being shown. Howell arrived on the scene first, with Knight following closely behind. Howell and Knight removed the Arrestee from her stopped car. The Arrestee was placed on the ground and put in handcuffs. The Arrestee was then lifted to her feet with Howell and Knight on either side. The Arrestee was unsteady on her feet. As the officers moved the Arrestee toward Howell's cruiser, she appeared to spit in Knight's face. Knight then "open hand smack[ed]" the Arrestee. After a few more steps, Knight grabbed the Arrestee by the face and told her not to spit on him again. Chief Humphreys testified to his observations about the Arrestee:

-3-

Throughout the whole -- all of the videos she is -- appears to be extremely intoxicated. She is resisting, no doubt is passively resisting the majority of the time. At some points in the video actively resisting just pulling her hands away, but through review, multiple times, all the videos, could not determine at any point she was combative or fighting or any definition thereof that would -- that she was actively aggressive or assaultive aside from the spitting to any officer on the scene.

Howell's body camera video was then played. Chief Humphreys testified that the Arrestee was neither combative nor fighting. Chief Humphreys stated: "No … the terms combative and fighting … would be some sort of punching, elbows, knees, heads, you know, head butting, biting, all of the things that you could describe as a combative fighting nature…. [T]he videos were absent of that." Chief Humphreys acknowledged that the Arrestee was using profanity toward the officers. Asked if that was unusual when dealing with drunk subjects, Chief Humphreys stated: "That's not unusual with any of the public." Chief Humphreys testified:

> As they stand her to her feet, begin moving her towards the patrol car, as it's also depicted in the car cameras, she's unsteady on her feet, knee buckles a little bit. They pick her up, she turns to Officer Knight spits in Officer Knight's face and from this angle clearly see Officer Knight with an open hand smacks [the Arrestee] in the mouth, which was not consistent, couldn't find consistency with the statement that he pushed her head back and away. I think it -- if it's -- a reasonable person would believe that is a strike and not just an attempt to evade being spit on again.

Chief Humphreys stated that any time a police officer uses force, that officer must complete a use of force report. Chief Humphreys was presented with a "resistance report" he testified had been completed by Knight. The report noted the spitting incident and the Arrestee's resistance to being moved. It also stated that Knight used the least amount of force necessary to push the Arrestee's head back. Chief Humphreys testified that the report was incorrect: "I think if you were to claim that outside policy that you struck someone in handcuffs, that they were in -- some threat to the officer or -- or the public or themselves, it would be important to include that in your use of force." Chief Humphreys was questioned as to whether Knight's actions violated Fairview General Rules. Chief Humphreys testified that Knight violated rule 2.03, Section F, regarding misrepresentation and falsification: "[R]eports of combative and fighting were -- were a misrepresentation and largely in my opinion to justify the actions that took place … the claim that he pushed her head back and away was again in my opinion a misrepresentation as it appears to be a strike to the face." Chief Humphreys also testified that Knight violated the rule on Non-

Deadly Force Restrictions, Section E: "I believe that he acted outside the scope of that because the person was in handcuffs. The spitting in the face is not imminent bodily harm for injury to the officer or anyone else…." Chief Humphreys continued: "I did concede that she was passively resistant but in the video she is moving toward the vehicle. She does need assistance due to her intoxication, but she's not resisting the move towards the cruiser." Chief Humphreys stated that Knight's use of force against the Arrestee appeared to be retaliatory. Chief Humphreys concluded by asking the City Manager to uphold his decision to terminate Knight.

On cross-examination, Chief Humphreys testified that the Tennessee Bureau of Investigation ("the TBI") had been called in to investigate the incident. However, Chief Humphreys stated that the TBI investigation played no part in the administrative investigation, which was conducted by Chief Humphreys himself. Chief Humphreys' investigation consisted of him reviewing the reports submitted about the August 16, 2019 incident as well as the video footage. Chief Humphreys' last contact with Knight was on the day of the incident. Chief Humphreys did not interview Knight or anyone else as part of his investigation into Knight's case. Continuing his testimony, Chief Humphreys stated that he did not believe progressive discipline was appropriate in this case, citing the severity of Knight's actions. Specifically, Knight's violations were "tier three" violations warranting immediate dismissal. Asked if he consulted the Human Resources Director as required by the city's handbook, Chief Humphreys stated that he simply submitted his paperwork to the city administration.

Chief Humphreys acknowledged that spitting on someone constitutes an assault. He testified further that he believed Knight had probable cause to charge the Arrestee with assault in connection with her spitting on him. Asked to reconcile this with his report that the Arrestee was not combative or fighting, Chief Humphreys stated: "It is my belief that there is multiple levels of aggression of which this one in my opinion does not meet one of combative or fighting." Chief Humphreys testified that he could recall no excessive use complaints against Knight in his tenure as chief, although Knight had once been involved in an excessive use of force incident. However, Knight was not the shooter in that incident, and he was not disciplined in connection with it. Chief Humphreys stated that he "[a]bsolutely" was of the opinion that Knight knowingly made misrepresentations about the August 16, 2019 incident. Asked if spitting on someone constitutes a "real threat" to someone, Chief Humphreys answered that he did not think it was. On the matter of his relationship with Knight, Chief Humphreys testified it was completely professional in nature and they had no personal relationship outside of work. Chief Humphreys was questioned further about his relationship with Knight as well as what he would have done in Knight's place:

Q. I mean, isn't it true that you don't like Officer Knight?

A. That is not true.

Q. So you haven't -- you haven't told anybody else that you dislike Officer Knight and you don't want him to come back to the department?

A. I didn't never say I didn't like him. I did say I do not want him to return to the department, hence my submission of termination.

Q. Okay. Let me ask you this Chief, how long have you been in law enforcement?

A. 24 years.

Q. So what would you have done in this situation?

A. I can not testify to hypotheticals, that's not factual.

Chief Humphreys was then asked about the resistance report. Chief Humphreys stated that he assumed Knight filled out the resistance report even though it lacked a date or signature. Instead, it only had Knight's name typed on it. Asked how he could be sure Knight filled it out, Chief Humphreys stated: "I guess we can ask him." Chief Humphreys testified that the report simply had been given to him as Knight's report.

Knight testified next. Knight stated he had been interviewed by the TBI and had received Miranda warnings. His case was to be presented to the grand jury the following January. Knight elected to proceed with testifying before the City Manager anyway. Knight testified to the August 16, 2019 incident as follows, in pertinent part:

When I showed up, Officer Howell was trying to get her out of the car. She was refusing. When we told her to get out of the car, she grabbed the steering wheel, locked her feet in. When we stepped in, she was kind of pushing towards, not really kicking at him, but pushing at him with her feet. She grabbed the back of the car seat. I told her she was getting out. We grabbed her. I grabbed her left arm, Officer Howell grabbed her right arm, and we removed her from the vehicle, put her on the ground and handcuffed her.

When we stood her up, she dropped her weight on us, whether that was because she was drunk or whether because she's trying to resist, all I know is she dropped her weight. We stood her back up. I said, you need to walk. That's when she turned, she was on this side here, she turned and looked at me in my face and said, f--- you, b----, and spit in my face. She got the side of my glasses. Luckily I had my mouth closed but it ended up on the side of my face. I pushed her head back with this hand, because I was holding her here. I did this, and then I grabbed her by the chin and said, don't do that again. I said -- and then we walked her to the car.

When we got her to the car, she refused to get in, that's where you see me walk around to the other side of the car. I come in from the driver's side

-6-

rear side. I grabbed her by her shoulders, lifted her up, Officer Howell grabbed her feet, and we put her in the vehicle. And that was the end of it.

Came back, did the report. I filled out the warrant for the assault. I added to Officer Howell's report which he had not done yet, so it did not get done that day because Officer Howell was still dealing with this individual….

It was my intent to add my warrant and a supplement to his report. I was advised later that Monday morning, this was the Monday following, that they did not want me to add that to his report, that I needed to do a separate report and that my report would be deleted.

So prior to me getting the opportunity to do that report, that same afternoon myself and Officer Howell were taken by the assistant chief to the City Manager's office where we met in the conference room and both of us were placed on administrative leave. So that report has never been done.

I do not recall ever filling out a Use of Force Report. If I did, I do not recall filling that out. I don't know if Officer Howell filled it out and my name was put on it, but I do not recall filling out the Use of Force at that time.

Knight testified he was concerned by the Arrestee's spitting on him because he did not know what sort of diseases she might have. Knight stated he did what he did in order to stop the Arrestee from spitting on him again. Knight denied smacking or striking the Arrestee. Knight stated: "If it had been my intent to slap her or injure her then I mean, I'm not trying to be arrogant, but she would have been injured." Knight stated that he merely pushed the Arrestee's head back.

Knight then testified to his background. Knight stated he is trained in defensive tactics. Knight testified that he spent twenty-one years in the army; had been a hand-to-hand combat instructor while in the military; was a police officer for five-and-a-half years at Vanderbilt Police Department; had gone through their two week training process with martial arts hall of famers; and was a defensive tactics instructor at Vanderbilt.

Regarding whether he had been subjected to an assault by the Arrestee, Knight testified: "It was my understanding that in the State of Tennessee if you spit on someone that's assault, and assault is combative, that was my interpretation. She spit in my face, to me that was being combative, and that's what I put in my report that she was being combative." Knight later served the Arrestee with a warrant for assault. Knight stated that, when he served the warrant, the Arrestee apologized to him for spitting on him. As to his relationship with Chief Humphreys, Knight stated it "has always been professional like he said." Summing up his position, Knight testified:

-7-

I do not believe that I did anything wrong. She spit in my face. I pushed her face back, grabbed her by the chin, and advised her not to do that again. I would have done the same had it been anybody else, male, female, doesn't matter. I did not purposely, if the report was misrepresented, it wasn't purposely done. I believe she was combative. She spit in my face, that's assault, that's combative. That was my understanding of it.

On cross-examination, Knight was asked if he stood by his testimony that he did not strike the Arrestee in light of the video footage:

Q. Officer Knight, when we all saw the video --
A. Sure.
Q. -- is it your testimony you did not strike this woman?
A. I pushed her head back, if it appears as a strike, but that was not the intent and it was not what I did.
Q. But is it your testimony you did not strike her?
A. Interpretation, I pushed her head back like that (indicating).
Q. And when you did what you just described was she handcuffed behind her back?
A. She was; yes, sir.
Q. And did you mention anywhere in any affidavit or report that you completed that you struck this woman?
A. I did not. I did not have an opportunity to do my report.

The hearing concluded. By letter dated December 18, 2019, the City Manager upheld Knight's termination. On February 14, 2020, Knight filed his Petition for Review and Writ of Certiorari against Fairview in the Trial Court. Knight brought his petition pursuant to Tenn. Code Ann. § 27-8-101 *et seq.*, and § 27-9-101, *et seq*. Knight also cited Tenn. Code Ann. § 4-5-322, under the Uniform Administrative Procedures Act ("the UAPA"). Knight's petition stated it was the first application for the writ and was supported by oath. The Trial Court then entered its Fiat to issue the Writ of Certiorari. In September 2020, the Trial Court heard Knight's petition. Knight alleged several defects in the termination procedure, to wit: Chief Humphreys failed to interview Knight; Chief Humphreys was biased against Knight; there was improper media influence on the decision to terminate Knight; Fairview failed to employ progressive discipline; Chief Humphreys failed to consult with Fairview's Human Resources Director prior to recommending Knight's dismissal; and there was a conflict in the City Manager presiding over Knight's pre-dismissal hearing. The Trial Court ordered Fairview to file a copy of its Policies and Procedures following the hearing. Fairview duly filed the copy.

In October 2020, the Trial Court entered its Memorandum and Order whereby it affirmed Fairview's termination of Knight. The Trial Court applied Tenn. Code Ann. § 4-5-322 as its governing law. Addressing each of the procedural defects alleged by Knight, the Trial Court found that Chief Humphreys' declining to interview Knight was an acceptable exercise of his professional judgment; that there was no evidence Chief Humphreys was personally biased against Knight; that there was no evidence of improper media influence on Fairview's decision to terminate Knight; that Chief Humphreys' decision to forego progressive discipline was within his professional discretion and in keeping with the Fairview Employee Policies and Procedures Manual; and that Chief Humphreys effectively did consult the Fairview Human Resources Director because the City Manager of Fairview also serves as its Human Resources Director, and even if this were deemed non-compliant, Knight failed to show he was prejudiced in any way. Regarding Knight's assertion that there was a conflict in the City Manager presiding over his pre-dismissal hearing, the Trial Court stated:

> In this case, the City Manager, upon recommendation from the Chief of Police, issued the City's initial decision to terminate Knight's employment. The City Manager then presided over the subsequent dismissal hearing. According to the Manual, "[t]he purpose of a dismissal hearing is to provide the basis for making a determination of whether the Department Head's decision to dismiss the employee was a reasonable one under the circumstances." It is apparent from the record that the decision to terminate Knight was made by Chief Humphreys, after conducting his own internal investigation into the events. It is equally apparent that Collins, in his role as an administrator, then acted to implement the Chief's decision by communicating it directly to Knight. Collins then presided, pursuant to the procedures outlined in the Manual, over Knight's dismissal hearing.
>
> Considering the specific facts and circumstances of this case, Knight has done nothing more than raise the possibility of a combination of the City Manager's administrative functions. Knight has not demonstrated any actual bias or unfairness to him resulting from this combined function. This is particularly true in this case because it is apparent that Collins acted only to communicate and effectuate the termination decision, which was ultimately made by Chief Humphreys. Accordingly, the Court finds this procedure not inherently inconsistent with notions of fundamental fairness, and therefore not a denial of the due process of law owed to Knight.
>
> The Court finds the City acted in substantial compliance with its disciplinary procedures, as outlined in the Manual, and those procedures worked to provide Knight the fair process required under the law.

-9-

(Footnote omitted). Finally, the Trial Court found that Fairview's termination of Knight was supported by substantial and material evidence:

> In this case, Knight's termination rests on two internal policy violations, as found by Chief Humphreys: (1) misrepresentation or falsification, in violation of the Fairview Police Department General Rules Section 2.03(F); and (2) inappropriate use of force, in violation of the Department's Chapter 4 Policy 4-01 Use of Force IV.F2(e).
>
> Fairview Police Department General Rules Section 2.03(F) reads: "No member shall, in an official capacity knowingly misrepresent any matter, sign any false official statement or report, commit perjury, or give false testimony before any court, grand jury, board commission, official hearing, or department hearing."
>
> The evidence cited by Chief Humphreys to support Knight's violation of the above policy is: First, in the written incident report prepared by another arresting officer, and supplemented by Knight, the officers referenced the combative and resistant nature of the arrestee. Knight's supplement specifically states: "[Arrestee] was combative and resisting."
>
> Chief Humphreys, based on his review of the video footage, did not believe the arrestee was combative, aggressive, or actively resisting arrest. Instead, Chief Humphreys believed Knight's characterization of the arrestee to be "a misrepresentation and largely in my opinion to justify the actions that took place on the scene."
>
> Additionally, Chief Humphreys noted that the same incident report characterized the physical contact between Knight and the arrestee as Knight having "restrained [the arrestee]'s head and mouth to prevent further incidents." Knight's supplement to the same incident report omitted any mention of physical contact between himself and the arrestee.
>
> In a Response to Resistance Report, which is unsigned but attributed by Chief Humphreys to Knight, the contact was described as "physical restraint" of the arrestee's "[a]rms and face." The narrative portion of that report states Knight "pushed her head back and away."
>
> Upon his review of the video footage, Chief Humphreys believed the written reports to contain significant misrepresentations of the physical contact. Instead, he concluded "a reasonable person would believe that is a strike and not just an attempt to evade being spit on again."
>
> With respect to the second violation, Policy 4-01 Section IV.F2(e) states: "Force shall not be used against persons in handcuffs, except as objectively reasonable to prevent imminent bodily harm to the officer, third parties, the handcuffed person from themselves, or as objectively reasonable, where physical removal is necessary to overcome passive resistance."

The evidence cited by Chief Humphreys to support violation (2) is as follows: Knight, in response to being spit at, struck the arrestee in the face with an open hand. The arrestee was handcuffed behind her back at that point. This series of events was clearly memorialized by the officers' dash and body camera video recordings, which Chief Humphreys carefully reviewed. Chief Humphreys concluded that the arrestee did not pose an imminent threat to Knight, herself, or anyone else at the scene, and in his opinion, Knight's use of force was "outside the scope" of the Department's use of force policy. Additionally, Chief Humphreys noted that he believed the strike to be retaliatory, rather than a necessary use of force.

The Court finds Chief Humphreys' decision to terminate Knight's employment for internal policy violations was supported by substantial and material evidence. The evidence in the record, particularly the video footage of the arrest in question, is sufficient to support Chief Humphreys' conclusion that the slap delivered by Knight was retaliatory, rather than defensive, and his determination that Knight's employment should be terminated. The City Manager, presiding over the dismissal hearing, reached the rational conclusion that there was a reasonable factual basis for that termination decision. The Court will not endeavor to re-weigh the facts or substitute its own judgment for that of the City administration acting in its area of expertise.

(Footnotes omitted). Knight timely appealed to this Court.

**Discussion**

Although not stated exactly as such, Knight raises the following issues on appeal: 1) whether Fairview unlawfully terminated Knight by violating a statutory or constitutional provision or basing the termination upon unlawful procedure; 2) whether Fairview unlawfully terminated Knight by acting arbitrarily or capriciously; and 3) whether Fairview unlawfully terminated Knight by failing to base its decision upon material evidence.

In deciding this case, the Trial Court applied the UAPA standard. Tenn. Code Ann. § 27-9-114 provides, as relevant:

(a)(1) Contested case hearings by civil service boards of a county or municipality which affect the employment status of a civil service employee shall be conducted in conformity with contested case procedures under the Uniform Administrative Procedures Act, compiled in title 4, chapter 5, part 3….

-11-

(b)(1) Judicial review of decisions by civil service boards of a county or municipality which affects the employment status of a county or city civil service employee shall be in conformity with the judicial review standards under the Uniform Administrative Procedures Act, § 4-5-322.

Tenn. Code Ann. § 27-9-114 (2017). In turn, Tenn. Code Ann. § 4-5-322 provides, as relevant:

(h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

(i) No agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affect the merits of such decision.
(j) The reviewing court shall reduce its findings of fact and conclusions of law to writing and make them parts of the record.

Tenn. Code Ann. § 4-5-322 (West April 11, 2019 to May 17, 2021).[3]

Substantial and material evidence has been defined as "such relevant evidence as a reasonable mind might accept to support a rational conclusion and to furnish a reasonably sound basis for the decision under consideration." *City of Memphis v. Civ. Serv. Comm'n of City of Memphis*, 238 S.W.3d 238, 243 (Tenn. Ct. App. 2007) (internal quotation marks and citations omitted). "[T]he substantial and material evidence standard does not justify reversal of an administrative decision only because the evidence could also support another

---

[3] This statute has since been amended. We apply the earlier version that was in effect when Knight was terminated and remained in effect throughout the proceedings below.

result." *Id.* (citing *Martin v. Sizemore*, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001)). "Rather, we may reject an administrative determination only if a reasonable person would necessarily arrive at a different conclusion based on the evidence." *Id.*

An arbitrary or capricious decision is one that is "not based on any course of reasoning or exercise of judgment, or ... disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *City of Memphis v. Civ. Serv. Comm'n of City of Memphis*, 238 S.W.3d at 243 (internal quotation marks and citations omitted). In addition, "[i]ssues of credibility are for the trier of fact, and this Court must give considerable deference to the trier of fact's factual findings." *Davis v. Shelby Cty. Sheriff's Dep't*, 278 S.W.3d 256, 266 (Tenn. 2009) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). However,

> In order for section 27-9-114(a)(1) to apply, there must (1) be a proceeding before a "civil service board" and (2) a decision that affects the "employment status" of a civil service employee. In the absence of either of these two prerequisites, the provisions of section 27-9-114 do not apply. If section 27-9-114 does not apply, then review is under the common law writ of certiorari, which limits the review to whether the administrative agency has exceeded its authority or has acted illegally, arbitrarily, or fraudulently. *See McCallen v. City of Memphis*, 786 S.W.2d 633, 638 (Tenn. 1990).

*Tidwell v. City of Memphis*, 193 S.W.3d 555, 559-60 (Tenn. 2006). The *Tidwell* Court held that an entity sitting in an adjudicative capacity that makes decisions affecting a worker's employment status is the "functional equivalent" of a civil service board for purposes of Tenn. Code Ann. § 27-9-114. *Id.* at 562-63. In *Tidwell*, the Tennessee Supreme Court found the panel at issue "was acting as the functional equivalent of a civil service board by holding hearings, analyzing evidence, and determining appeals from administrative decisions to grant or deny benefits to injured employees." *Id.* at 563.

Under the common law writ of certiorari, the evidentiary standard for reviewing courts is whether "any material evidence" supports the board or agency's decision. *Leonard Plating Co. v. Metro. Gov't of Nashville & Davidson County*, 213 S.W.3d 898, 904 (Tenn. Ct. App. 2006) (citations omitted). Material evidence is "relevant evidence that a reasonable person would accept as adequate to support a rational conclusion." *Id.* (citations omitted). "The amount of material evidence required to support a board's or agency's decision must exceed a scintilla of evidence but may be less than a preponderance of the evidence." *Id.* (citations omitted).

Neither party raises an issue concerning which standard of review is applicable. Instead, the parties refer to the UAPA and common law standards almost interchangeably. There appears to have been some uncertainty below, at least initially, as to which standard to apply.[4] We apply the UAPA in our review herein, but even if the common law writ of certiorari standard of review were the appropriate standard, the discrepancy would not be dispositive in the context of this case. *See Nall v. City of Oak Ridge*, No. E2013-02608-COA-R3-CV, 2014 WL 5099588, at *7 (Tenn. Ct. App. Oct. 10, 2014), *no appl. perm. appeal filed* ("The trial court incorrectly applied the UAPA [rather than the common law writ of certiorari standard], but the decision of the City's Board was supported under either evidentiary standard."). As we will discuss, the same result would obtain here by applying either standard.

We first address whether Fairview unlawfully terminated Knight by violating a statutory or constitutional provision or basing the termination upon unlawful procedure. In his brief, Knight argues that it was "simply and inherently unfair for the administrator who made the determination to terminate the Appellant's employment and who drafted the termination letter to also be the hearing officer for the Pre-Dismissal Hearing." Knight asserts that his procedural due process rights under both the Tennessee and United States Constitutions were violated. Fairview argues in response that Knight was an at-will employee with no property interest at stake and thus procedural due process rights are not implicated here. In *Keller v. Casteel*, a case in which a municipal firefighter employed at-will challenged his termination by means of petition for writ of certiorari, the Tennessee Supreme Court found that the petitioner waived "any argument that he has a constitutionally protected liberty interest in this case. Thus, the threshold consideration for Mr. Keller's procedural due process claim is whether he had a property interest that entitled him to due process protection. Absent a protected property interest, there can be no due process violation." *Keller v. Casteel*, 602 S.W.3d 351, 357 (Tenn. 2020). The Tennessee Supreme Court concluded that "[w]ithout a protected property interest, he cannot assert a claim for a due process violation. We hold that Mr. Keller has not shown a property interest entitled to due process protection." *Id.* at 362. Additionally, this Court has stated that "[o]bviously, an at-will employee does not have a legitimate entitlement to continued employment. An at-will employee has no entitlement to his or her position and therefore no property interest to be deprived of if he or she is summarily dismissed." *Faulkner v. City of Bartlett*, No. W2008-02225-COA-R3-CV, 2009 WL 1841743, at *4 (Tenn. Ct. App. June 29, 2009) (citations omitted), *Rule 11 perm. app. denied Feb. 22, 2010.* Undaunted, Knight states:

> The Appellant understands that he was an at-will employee and that he might not have had any constitutional property rights as an employee or former

---

[4] Indeed, it is not necessarily obvious that the City Manager constituted a "civil service board."

-14-

employee of the City. But the Appellant would submit that the actions of the City were so egregious, that this Court should find that he did in fact have due process rights and that those rights were violated by the City.

We respectfully decline Knight's request to find, or infer, constitutional protections or procedural due process rights where none exist. Knight was an at-will employee. He had no property interest in continued employment with Fairview.[5] Procedural due process thus is not implicated. However, even if due process were implicated, Knight has failed to show that the process he received was in any sense fundamentally unfair or in violation of his rights, let alone "egregious." The fact that the City Manager held multiple roles in the termination process does not automatically create fundamental unfairness. This Court has discussed the phenomenon of overlapping administrative functions as follows:

> Mr. Martin's procedural due process challenge in this case rests on his belief that the Board and the Department failed to insulate the lawyers who prosecute cases before the Board from those who advise and represent the Board in other matters. The courts and academics have considered the due process implications of various combinations of the investigating, prosecuting, and decision-making functions by administrative agencies. They recognize that we do not live in a perfect world and that reality dictates operating in judicial and administrative systems that potentially contain some amount of unavoidable human predilection. Martin H. Redish & Lawrence C. Marshall, *Adjudicatory Independence and the Values of Procedural Due Process*, 95 Yale L.J. 455, 492 (1986) ("Redish & Marshall"). They also recognize that the variety and complexity of administrative processes being used in this country will not yield to a single organizing principle, *Withrow v. Larkin*, 421 U.S. at 52, 95 S.Ct. at 1467, and that the pristine separation of functions characteristic of the criminal law is not entitled to be enshrined as the exclusive means for resolving disputes. *Howitt v. Superior Court*, 3 Cal.App.4th 1575, 5 Cal.Rptr.2d 196, 200 (1992); *Administrative Law Treatise* § 9.9, at 92; 2 Charles H. Koch, *Administrative Law and Practice* § 6.11[1], at 309 (2d ed. 1997) ("*Administrative Law and Practice*"); Michael Asimow, *When the Curtain Falls: Separation of Functions in the Federal Administrative Agencies*, 81 Colum. L.Rev. 749, 768 (1981). Accordingly, there is a clear consensus that some combination or overlapping of functions in an administrative proceeding is not inconsistent with fundamental fairness. *Administrative Law Treatise* § 9.9, at 93.

---

[5] Knight's counsel candidly acknowledged as much at the hearing held before the Trial Court, stating: "We had a pre-dismissal hearing before the city manager. The petitioner concedes that there is no property interest. Tennessee is an at-will employment state, so he was appreciative for the fact that there was a hearing in the first place because he could have just been fired."

*Martin*, 78 S.W.3d at 264.

We find, as did the Trial Court, that the City Manager's combination of functions was not inherently inconsistent with notions of fundamental fairness. The mere fact that the City Manager drafted Knight's termination letter does not mean Knight was deprived of a fair hearing when he later went before the City Manager. It is clear from the record that Chief Humphreys initiated Knight's termination; the City Manager simply set the administrative process in motion based upon the chief's request. At the hearing, Knight appeared with counsel and testified. He had a full and fair chance to put his case to the City Manager and did so. Knight received a fair hearing. That Knight failed to receive a favorable result from the City Manager does not *ipso facto* mean the process was unfair or that the City Manager was biased against him.

Elsewhere on this issue, Knight argues that he was wrongfully terminated without the benefit of progressive discipline; that there are no pending criminal charges against him; that the Human Resources Director was never consulted on his termination in violation of the Employee Handbook; and that Chief Humphreys made certain errors on his "Corrective Action Plan," which stated Knight responded to a "drunk driver" call when it was a "reckless driver" call and that the incident was recorded on Knight's body camera when it was not.

First, Knight was not entitled to progressive discipline, and his offense was deemed severe enough to warrant outright termination. Second, the lack of criminal charges against Knight is irrelevant as this was an administrative rather than a criminal matter. Third, the evidence reflects that the City Manager also was the Human Resources Director in Fairview, and that, in any event, Knight failed to show any prejudice resulting from failure to consult the Human Resources Director. Fourth, the errors Chief Humphreys made on the Corrective Action Plan as cited by Knight are of no consequence. It does not matter for purposes of this appeal whether Knight was responding to a "drunk driver" call or a "reckless driver" call. It also does not matter if Chief Humphreys wrongly stated that the incident was recorded on Knight's body camera; it is undisputed that the August 16, 2019 incident was recorded on video, albeit by other means. In sum, we find no merit in Knight's contention that Fairview conducted illegal procedures or violated any statutory or constitutional provisions in the course of Knight's termination.

We next address whether Fairview unlawfully terminated Knight by acting arbitrarily or capriciously. On this issue, Knight points to numerous alleged examples of arbitrary or capricious decision-making, such as that Chief Humphreys pushed for Knight's

termination even though the criminal investigation was incomplete;[6] that Knight never was interviewed; that Knight denies ever filling out the Use of Force Report that was part of the case against him; and, essentially, that Chief Humphreys disliked Knight or otherwise was improperly motivated by bias.

Initially, we reiterate that this was an administrative proceeding, not a criminal matter. The criminal investigation has no bearing on the disposition of this case; Fairview's termination of Knight for violating internal policies stands or falls on its own. As to Chief Humphreys' failure to interview Knight, the latter fails to explain why such an interview was necessary or required. Chief Humphreys had the benefit of the written reports as well as video of the incident. Regarding Knight's contention that he did not fill out the Use of Force Report attributed to him, he is correct in that the document shows no signature from Knight, or from a supervisor, or from the chief. However, Knight's name is typed on the report. Furthermore, this Use of Force Report is not the only evidence in the record concerning Knight and misrepresentation. There is also the incident report and Knight's supplement. That Knight wrote a report in the wake of the August 16, 2019 incident does not appear to be in serious dispute. Knight himself testified: "She spit in my face, to me that was being combative, and that's what I put in my report that she was being combative." (Emphasis added). Finally, we, like the Trial Court, find no evidence reflecting that Chief Humphreys held any sort of personal bias against Knight. Chief Humphreys testified that he had said he did not want Knight back in his department. That is hardly surprising, as Chief Humphreys recommended that Knight be fired. That alone is not evidence of a personal grudge or bias. Like the Trial Court, we find no evidence that Knight's termination was driven by bias against him. In sum on this issue, we find that Fairview did not act in an arbitrary or capricious manner.

The third and final issue we address is whether Fairview unlawfully terminated Knight by failing to base its decision upon material evidence. To recap, Knight was terminated for violating rules against misrepresentation and improper use of force. With regard to misrepresentation, Knight argues: "The Chief might disagree with the Appellant's assessment of how the incident occurred, but there is no validity in any argument that the Appellant lied or misrepresented any facts in his report." With respect to improper use of force, Knight states that "[i]t was objectively reasonable for him to control [the Arrestee's] mouth and what was physically coming out of it to protect himself and his family from any further assaults with saliva from an unknown person," and further that "[t]he Appellant would submit that he did not violate any Use of Force statutes and he did not violate any Use of Force policies of the City." However, the video footage contained in the record undercuts Knight's arguments. We have reviewed the video footage. Knight clearly hit the Arrestee in the face while she was in handcuffs and being led to a police cruiser. Knight

---

[6] The Trial Court found that, as a result of the TBI's investigation, the grand jury returned No True Bill.

-17-

asserts that he was justified in hitting the Arrestee in response to her assaulting him by spitting on him. Nevertheless, the City Manager heard testimony from Chief Humphreys to the effect that spitting on an officer does not give that officer carte blanche to strike the spitting person however he sees fit, and that Knight's action appeared to be retaliatory rather than preventative in nature. The video bears out this interpretation of the incident. In addition, the video offers support for the conclusion that Knight misrepresented the degree to which the Arrestee was "combative" or "resisting" so as to justify his hitting her in the face.

Our standard of review is limited, and we are not called upon to make a fresh determination about Knight's termination. On this issue, the question simply is whether the decision to terminate Knight was supported by substantial and material evidence. We find that it was. The City Manager had the benefit of, among other things, the video evidence, Knight's written report, and the testimony from the hearing. These pieces of evidence constitute substantial and material evidence, under any definition of that term, upon which the City Manager could rationally conclude that Knight improperly used force on the Arrestee and misrepresented the situation afterward in violation of Fairview internal policies. Thus, the decision to terminate Knight was based upon evidence that was at least substantial and material. We affirm the judgment of the Trial Court in all respects.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Kodi Gail Knight, and his surety, if any.

s/ D. Michael Swiney_____
D. MICHAEL SWINEY, CHIEF JUDGE